1  MATTHEW G. BALL (SBN 208881)
   matthew.ball@klgates.com
2  K&L GATES LLP
   4 Embarcadero Center, Suite 1200
3  San Francisco, CA 94111
   Telephone: 415.882.8200
4  Facsimile: 415.882.8220

5  Attorney for Plaintiff World Wrestling
   Entertainment, Inc.
6

**FILED**

MAR 18 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**SEALED BY COURT ORDER**

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

**VC**

10  WORLD WRESTLING
    ENTERTAINMENT, INC.,
11

**C V 15 1263**

Case No. _____

12            Plaintiff,

13       vs.

14  JOHN AND JANE DOES 1-100,
    and XYZ CORPORATIONS 1-100,
15

16            Defendants.

**EX PARTE MOTION FOR TRO; ORDER
FOR SEIZURE OF COUNTERFEIT
MARKED GOODS; AND ORDER TO
SHOW CAUSE WHY A PRELIMINARY
INJUNCTION SHOULD NOT ISSUE**

17

18

19

20

21

22

23

24

25

26

27

28

ORIGINAL

Plaintiff World Wrestling Entertainment, Inc. ("WWE"), pursuant to the Federal Trademark Act of 1946, 15 U.S.C. § 1051 et seq., as amended (the "Lanham Act"), including the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d), the All Writs Act, 28 U.S.C. § 1651, and Rule 65(b) of the Federal Rules of Civil Procedure, hereby moves this Court for (1) a Temporary Restraining Order ("TRO") enjoining Defendants' unauthorized production, distribution, and sale of souvenirs, merchandise, memorabilia, and other products bearing counterfeits of WWE's trademarks and service marks or marks confusingly similar to WWE's trademarks and service marks; (2) an Order authorizing the seizure of goods bearing counterfeit marks wherever they may be found on the premises or within a five-mile radius of the halls, arenas, stadiums, or other venues where WWE's Wrestlemania® 31 weekend events shall be occurring in Santa Clara and San Jose, California from March 26 through March 30, 2015, including, but not limited to at the San Jose Convention Center, San Jose University, Camera 12 Theater, Levi's Stadium and the SAP Center; and (3) an Order to show cause why a preliminary injunction should not issue.

In support of this Motion, WWE submits concurrently herewith a supporting legal memorandum, a Verified Complaint, the Declaration of Lauren Dienes-Middlen, Esq. (attached hereto as Exhibit A), and a proposed Order. In further support of this Motion, WWE states the following:

1. Since at least as early as February 1983, WWE, first doing business as the "World Wrestling Federation" and now doing business as "World Wrestling Entertainment," has provided to the public live and televised wrestling and entertainment events and services (the "WWE Wrestling Services") under the service mark WORLD WRESTLING ENTERTAINMENT®. See Verified Complaint at ¶ 10. WWE also exclusively owns or controls of all right, title and interest in the names, likenesses and rights of publicity for its current wrestlers. Id. In connection therewith,

---

**EX PARTE MOTION FOR TRO; ORDER FOR SEIZURE OF COUNTERFEIT MARKED GOODS; AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

WWE has used, advertised, publicized and presented the WWE Wrestling Services, and related souvenirs, merchandise and other products ("WWE Merchandise") under the WORLD WRESTLING ENTERTAINMENT® mark and certain other service marks and trademarks (collectively, the "WWE Marks"). Id.

2.     As more fully set forth in Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion ("Memorandum"), beginning in Santa Clara and San Jose, California on March 26, 2015 with WWE's Wrestlemania® 31 weekend and ending March 28, 2016 (WWE's final live event before Wrestlemania® 32), WWE will embark on a multi-city presentation of live wrestling entertainment events throughout the United States and in many other cities throughout the world ("WWE's 2015-2016 Live Events"). Based on past experiences, particularly in connection with prior live events, including prior Wrestlemania® weekend events, WWE reasonably believes that Defendants, whose identities and precise whereabouts are currently unknown to WWE, will be selling counterfeit WWE Merchandise in the Northern District of California before, during and after the Wrestlemania® 31 weekend events. See generally Declaration of Lauren Dienes-Middlen, Esq., ("Dienes-Middlen Dec."); World Wrestling Ent., Inc. v. Unidentified Parties, 770 F.3d 1143 (5th Cir. 2014).

3.     Defendants' merchandise will bear counterfeit trademarks and service marks unauthorized by WWE and, based on past experience, will be of inferior quality compared to authentic WWE Merchandise. See generally Dienes-Middlen Dec. Indeed, the merchandise sold by Defendants not only is counterfeit but the merchandise also threatens public safety. There is no way to know the quality of the counterfeit goods, such as the flammability level of the ink used to print the t-shirts and the safety of the design of other goods, such as wrestling masks, that previously have been seized. Also based on past experience, WWE reasonably believes that Defendants will travel

EX PARTE MOTION FOR TRO; ORDER FOR SEIZURE OF COUNTERFEIT MARKED GOODS; AND
ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

from city to city following WWE's 2015-2016 Live Event schedule and sell counterfeit merchandise at WWE's 2015-2016 Live Events throughout the United States.

4.      WWE is entitled to the proposed TRO, Seizure Order and Order to Show Cause because there is a strong probability that WWE will prevail on the merits, and the threat of irreparable harm to WWE is clear and substantial, as WWE's reputation and goodwill stand to be injured by the sale of inferior-quality counterfeit WWE Merchandise.

5.      WWE is likely to succeed in showing that the Defendants are using counterfeit WWE marks in connection with the sale, offering for sale, or distribution of goods and services, and further, that the Defendants are part of a concerted operation that travels from venue to venue selling counterfeit WWE Merchandise that is acquired from common sources of manufacture, and that these and any other vendors of such unauthorized counterfeit marked merchandise are in active concert or participation.

6.      Immediate and irreparable injury to WWE will occur if goods bearing counterfeit marks are not seized because (a) WWE will lose an indefinite number of sales of its genuinely-marked goods that cannot be made up after the events; (b) WWE will have no remedy at law against Defendants because it will have no way of learning their identity and volume of their sales of counterfeit WWE Merchandise; and (c) Defendants' counterfeit WWE Merchandise is believed to be of lower price and inferior quality to WWE's genuine goods, and WWE will suffer loss of reputation and consumer goodwill by the sale of counterfeit WWE Merchandise.

7.      The goods to be seized will be located on the premises or within a five-mile radius of the halls, arenas, stadiums, or other venues where WWE's Wrestlemania® 31 weekend events shall be occurring in Santa Clara and San Jose from March 26 through March 30, 2015, including, but not limited to at the San Jose Convention Center, San Jose University, Camera 12 Theater, Levi's

Stadium and the SAP Center.

8.     The harm to WWE of denying this application outweighs the harm to any legitimate interests of Defendants.   In fact, Defendants have no right whatsoever to sell goods bearing counterfeit marks.

9.     In addition, issuance of the requested TRO will protect the public against deception, mistake and potentially unsafe products.  The public interest will be served by granting the requested Order because the public has a right to rely on valid trademarks and service marks as accurate indicia of origin of goods and services and the high-quality, safe products associated with those trademarks and service marks.

10.    The need for immediate relief from the Court is great, as the substantial sale of the infringing goods and the corresponding injury to WWE and the public is expected to occur during the Wrestlemania® 31 weekend events in Santa Clara and San Jose, California from March 26 through March 30, 2015, resulting in irrecoverable lost sales, loss of reputation, and loss of goodwill for WWE, and damages to the consuming public in the form of continued confusion, deception and potential harm to safety.  In addition, absent the requested relief, it will be difficult and costly for WWE to obtain speedy relief from the Court and will result in an inefficient use of judicial resources.

11.    An Order other than an ex parte Seizure Order is not adequate to achieve the purposes of 15 U.S.C. § 1114, which provides remedies for trademark infringement, and the proposed Order is specifically authorized by the Trademark Counterfeiting Act, 15 U.S.C. § 1116(d).   WWE has complied with all statutory requirements for the issuance of a Seizure Order pursuant to 15 U.S.C. § 1116(d).

12.    If this Motion is denied, neither money damages nor any accounting will be available

to WWE, as such Defendants will leave the area immediately upon selling their counterfeit goods. Moreover, Defendants will then no longer be subject to the jurisdiction of this Court, should the immediate injunctive relief requested here be denied.

13.    Without the granting of the granting of the Order of Seizure sought herein, it would be futile for WWE to continue this action. A preliminary injunction without an accompanying Order of Seizure would be ineffective in redressing WWE's injuries, and in preventing Defendants from committing their deceptive trade practices and unlawful acts, as they would already have occurred.

14.    Accordingly, WWE requests this Court to enter an Order authorizing the immediate seizure of counterfeit WWE merchandise located on the premises or within a five-mile radius of the halls, arenas, stadiums, or other venues where WWE's Wrestlemania® 31 weekend events shall be occurring in Santa Clara and San Jose, California from March 26 through March 30, 2015, including, but not limited to at the San Jose Convention Center, San Jose University, Camera 12 Theater, Levi's Stadium and the SAP Center. As shown in the accompanying Memorandum (see, e.g., Exhibits A and C to Memorandum), courts have granted WWE (and others) orders authorizing the seizure of goods bearing counterfeit marks, like counterfeit WWE Merchandise, on ex parte application.

15.    The certificate of counsel required by Fed. R. Civ. P. 65(b) attesting to the importance of hearing the within motion without notice to Defendants is attached as Exhibit B.

WHEREFORE, for the reasons set forth above, Plaintiff respectfully requests this Court to grant this Motion and enter an Ex Parte Temporary Restraining Order, an Order for Seizure of Counterfeit Marked Goods and an Order to Show Cause Why a Preliminary Injunction Should Not Issue.

A proposed Order is submitted herewith.

**EX PARTE MOTION FOR TRO; ORDER FOR SEIZURE OF COUNTERFEIT MARKED GOODS; AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Dated: March 17, 2015

Respectfully submitted,

WORLD WRESTLING ENTERTAINMENT, INC.

Matthew G. Ball (SBN 20881)
Matthew.Ball@klgates.com
**K&L GATES LLP**
4 Embarcadero Ctr., Suite 1200
San Francisco, CA 94111
Telephone:      (415) 882-8200
Facsimile:       (415) 882-8220

Jerry S. McDevitt (*pro hac vice* motion to be filed)
Curtis B. Krasik (*pro hac vice* motion to be filed)
Christopher M. Verdini (*pro hac vice* motion to be filed)
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501
*Attorneys for Plaintiff*

**EX PARTE MOTION FOR TRO; ORDER FOR SEIZURE OF COUNTERFEIT MARKED GOODS; AND
ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

1  MATTHEW G. BALL (SBN 208881)
   matthew.ball@klgates.com
2  K&L GATES LLP
   4 Embarcadero Center, Suite 1200
3  San Francisco, CA  94111
   Telephone: 415.882.8200
4  Facsimile: 415.882.8220

5  Attorney for Plaintiff World Wrestling
   Entertainment, Inc.
6

7
                    UNITED STATES DISTRICT COURT
8
                   NORTHERN DISTRICT OF CALIFORNIA
9

10  WORLD WRESTLING                    Case No. _____
    ENTERTAINMENT, INC.,
11                                     **DECLARATION OF LAUREN DIENES-**
12              Plaintiff,             **MIDDLEN, ESQ.**

13         vs.

14  JOHN AND JANE DOES 1-100,
    and XYZ CORPORATIONS 1-100,
15
16              Defendants.

17
18
19
20
21
22
23
24
25
26
27
28

              DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.

I, Lauren Dienes-Middlen, state that:

1. I am Vice President, Intellectual Property and Legal Affairs of Plaintiff World Wrestling Entertainment, Inc. ("WWE") located at 1241 East Main Street, Stamford, Connecticut 06902. I am authorized to make this declaration, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(d), in support of WWE's <u>Ex Parte</u> Motion for Temporary Restraining Order, Order of Seizure and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

2. I certify that I have personal first-hand knowledge about the matters discussed below unless otherwise indicated and am competent to testify about them if called upon to do so.

3. I have worked with WWE for the last 14 years in connection with, among other things, the acquisition, maintenance and enforcement of WWE's intellectual property. During that time, I have been involved with WWE's application for and enforcement of temporary restraining orders, seizure orders and preliminary injunctions to stop counterfeiters from selling counterfeit WWE merchandise at WWE live events, where WWE sells a large variety and volume of genuine WWE merchandise.

4. WWE licenses the right to print, manufacture, distribute, offer for sale and sell merchandise bearing WWE's protected trademarks and service marks to a limited number of entities. As a condition of each such license, WWE requires that licensees refrain from selling licensed products in the vicinity of any WWE live event. As a result, WWE is able to control the WWE merchandise that is sold at and in connection with WWE live events.

5. For each WWE live event, venue merchandise coordinators meet in advance to discuss the merchandise and the market and agree on the logistics of the merchandise sales for the particular event, such as the number and location of the booths, number and location of personnel,

**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.**

how many of each type of shirt or other merchandise to have on hand, whether and how much security is needed for bootleg vendors, and other such information.

6. On the day of each event, the venue merchandise team is present at the arena, coordinates and inspects the sales facilities and plan, and supervises and monitors the overall sales operation for WWE. After the event, the team oversees the accounting for all sold merchandise, as well as the counting and repackaging of any unsold merchandise, and creates a detailed report summarizing this information.

7. At some events, WWE coordinates with security officers or investigators hired by WWE, and with local law enforcement officers, if available, regarding security against unauthorized vendors, or counterfeiters, who are selling, or bootlegging, unauthorized WWE merchandise bearing counterfeit trademarks. Whether or not there is separate bootleg security, the WWE venue merchandise team often works with the WWE investigative team patrolling and canvassing the outside of the arena, its parking lots, and surrounding areas before, during and after each event to identify bootleggers and counterfeit merchandise.

8. Because they are intimately familiar with the limited number and types of self-sourced WWE merchandise offered for sale at live WWE events, the venue merchandise coordination team easily can distinguish counterfeit merchandise from legitimate WWE product. Moreover, because of the limited number of licensees who are authorized to print, manufacture, distribute, offer for sale, and sell WWE merchandise, the venue merchandise team also can discern counterfeit merchandise bearing inferior imitations of WWE's protected trademarks and service marks from official, licensed merchandise. I also have created a booklet that identifies WWE's authorized merchandise by design so that official, licensed merchandise can be readily distinguished from counterfeit merchandise.

9. In 2001, as a result of the broad counterfeiting that WWE was encountering at its live

DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.

events, WWE obtained a Temporary Restraining Order (and, subsequently, a nationwide Preliminary Injunction Order) and Order for Seizure ("Seizure Order") from the District Court for the District of Massachusetts prohibiting the sale of counterfeit marked goods and authorizing the seizure of such goods at WWE live events across the United States throughout 2001-02.

10.    In 2002, WWE obtained a similar Seizure Order from the District Court for the Eastern District of New York in connection with WWE's nationwide series of live events in 2002-03.

11.    Many of the individuals served across the United States under these prior Seizure Orders refused to identify themselves, refused to accept service, or both. To my knowledge, none of the Defendants served with notice of the litigation indicated an intention to come forward with objections to the Court or otherwise moved for relief in accordance with the Seizure Orders.

12.    During the period from 2001-03, WWE vigilantly enforced such orders at its live events and over time began to see the deterrent effect of the orders, namely a decrease in the number of counterfeiters at WWE live events. In fact, once WWE began enforcing the seizure orders, some of the counterfeiters encountered were already aware of the existence of the orders.

13.    Because of the significant legal expenses necessary to obtain the federal court temporary restraining orders, seizure orders and preliminary injunctions, along with the decrease in counterfeiting activity after the two years of nationwide enforcement, WWE did not seek an injunction for the nationwide series of live events in 2003-04.

14.    As the years passed, however, WWE saw the number of counterfeiters at its live events increase, and again became the victim of repeated counterfeiting sales outside of its live events. Although WWE diligently attempted to identify and stop the counterfeiters without the help of local law enforcement, the counterfeiters refused to identify themselves, simply moved to another area when approached and/or gave WWE false information.

DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.

15.     As a result of the increase in counterfeiting activity at WWE live events, in 2008, WWE sought and obtained an Ex Parte TRO and Seizure Order from the District Court for the Middle District of Florida in connection with WWE's Wrestlemania® XXIV events at the Amway Arena and the Citrus Bowl in Orlando, Florida.

16.     At the Wrestlemania® XXIV events alone, WWE encountered numerous counterfeiters and, pursuant to the Ex Parte TRO and Seizure Order, WWE was able to obtain the identities of some of the counterfeiters (who became named defendants) and seize more than 1,000 counterfeit t-shirts.

17.     Encouraged by this success, WWE sought and obtained an Ex Parte TRO and Seizure Order from the District Court for the Southern District of Texas in 2009 in connection with WWE's Wrestlemania® XXV events at the Reliant Center and Toyota Center in Houston, Texas. Similar to the Wrestlemania® XXIV events, WWE encountered numerous counterfeiters at the Wrestlemania® XXV events and, pursuant to the Ex Parte TRO and Seizure Order, WWE was able to obtain the identities of some of the counterfeiters (who became named defendants) and seize approximately 1,500 counterfeit t-shirts.

18.     I was at WWE's Wrestlemania® XXVII weekend events, held March 30-April 4, 2011, in Atlanta, Georgia, and WWE similarly encountered an untold number of individuals, who came from all over the United States, distributing and selling Counterfeit Merchandise. With the aid of an ex parte TRO and seizure order granted by the United States District Court for the Northern District of Georgia, WWE was able to gain some measure of control over such counterfeiting by seizing more than 3,000 counterfeit t-shirts during the Wrestlemania® XXVII weekend events. The t-shirts were being sold for at least $10 per shirt.

19.     From March 29, 2012 through April 1, 2012, I was in Miami, Florida for WWE's Wrestlemania® XXVIII Weekend Events, which included (1) WWE's Wrestlemania® Axxess event

at the Miami Beach Convention Center from March 29-April 1; (2) the 2012 WWE Hall of Fame Induction Ceremony at American Airlines Arena on March 31; and (3) WWE's Wrestlemania® XXVIII event at Sun Life Stadium on April 1. I assisted with the enforcement of an ex parte Temporary Restraining Order and Order of Seizure issued by the United States District Court for the Southern District of Florida and testified before the District Court regarding those and past WWE enforcement efforts.

20. Despite a substantial police presence at and around each of the Wrestlemania® XXVIII Weekend Events in Miami, Florida, WWE encountered counterfeiters from California, New York, and Florida. Through enforcement of the ex parte Temporary Restraining Order and Seizure Order, WWE seized hundreds of counterfeit T-shirts. Many of the counterfeit shirts were identical in design, even though they were sold by different vendors from different locations.

21. I also was in East Rutherford, New Jersey, from April 4 through April 7, 2013 for WWE's Wrestlemania® XXIX Weekend Events, which included WWE's Wrestlemania® Axxess event at the IZOD Center from April 4-7 and WWE's Wrestlemania® XXIX event at MetLife Stadium on April 7. I assisted with the enforcement of an ex parte Temporary Restraining Order and Order of Seizure issued by the United States District Court for the District of New Jersey on March 27, 2013.

22. At the Wrestlemania® XXIX Weekend Events, WWE encountered counterfeiters from California, New York, Pennsylvania and Connecticut. In addition, WWE encountered counterfeit items being sold at a nearby third party wrestling expo. This event was held at a nearby expo center and had been intentionally scheduled to be in the same vicinity as WWE's events so that it could capitalize on selling merchandise to thousands of WWE fans that were visiting the area to attend our events. The organizers of this event were already handing out advertisements for their 2014 event, which they scheduled to take place on the same dates as WWE's Wrestlemania® 30

**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.**

events in New Orleans, LA. Indeed, prior to the Wrestlemania® 30 weekend, WWE was advised by the Chairman of the Louisiana State Boxing and Wrestling Commission that eight other licensed wrestling events were scheduled to take place in Louisiana that weekend, likely trying to capitalize on WWE's Wrestlemania® 30 events.

23. Through enforcement of an ex parte Temporary Restraining Order and Seizure Order issued by the United States District Court for the District of New Jersey, WWE seized counterfeit T-shirts, DVDs, action figures and posterboards and obtained a permanent injunction against one of the counterfeiters. Similar to past live events, many of the counterfeit shirts were identical in design, even though they were sold by different vendors from different locations.

24. Attached hereto as Exhibit 1 is a PowerPoint presentation that I created after the Wrestlemania® XXIX Weekend Events. The presentation illustrates the counterfeit merchandise that WWE seized during the Wrestlemania® XXIX Weekend Events pursuant to the court's March 27, 2013 Order. In addition, the first slide of the PowerPoint presentation shows counterfeit merchandise that WWE encountered in Pittsburgh, Pennsylvania and Cincinnati, Ohio more than two weeks prior to Wrestlemania® and that also appeared at the Wrestlemania® XXIX Weekend Events.

25. Last year, I was in New Orleans, Louisiana, from April 2 through April 7, 2014 for WWE's Wrestlemania® 30 Weekend Events, which included WWE's Wrestlemania® 30 event at the Mercedes Benz Superdome on April 6. I personally observed counterfeiting activity in and around the Superdome as well as the adjacent streets. Because the United States District Court for the Eastern District of Louisiana denied WWE's application for an ex parte Temporary Restraining Order and Seizure Order, WWE was limited in the actions it could take against the counterfeiters. I worked with local law enforcement and we seized limited counterfeit merchandise from four counterfeiters all of whom were selling the identical counterfeit merchandise.

**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.**

26.     Based on my first-hand experience, the modus operandi of the counterfeiters operating during WWE's Wrestlemania® Weekend Events includes offering to sell the counterfeit merchandise inside the venues where the events were being held, in front of the venues where the events were being held as well as in surrounding streets, in parking areas near the WWE events, areas where traffic becomes congested near the event, and areas between the parking areas and the event venues.

27.     Attached hereto as Exhibit 2 is a PowerPoint presentation that I created after the Wrestlemania® XXVIII Weekend Events in Miami, Florida showing the counterfeiting activities WWE encountered.  I presented Exhibit 2 to the District Court in connection with live testimony. The District Court relied upon this Exhibit in granting WWE a nationwide preliminary injunction and seizure order.

28.     In addition, after the Wrestlemania® Weekend Events, counterfeiters will follow WWE's live events around the country selling the same or similar counterfeit merchandise.  For example, attached hereto as Exhibit 3 is a true and correct copy of an arrest report from a WWE live event in Oklahoma City, Oklahoma, on February 6, 2012 pursuant to the Preliminary Injunction and Order of Seizure entered by the District Court for the Southern District of Florida.  The officer seized 27 bootleg WWE T-shirts from the counterfeiter.  The counterfeiter, who claimed to be from Las Vegas, Nevada, admitted to the arresting officer that he was standing outside the venue next to a line of people to sell unauthorized WWE T-shirts and that he "follows the WWE around" to sell the T-shirts.

29.     Attached hereto as Exhibit 4 is a true and correct copy of photographs of counterfeit merchandise that WWE seized pursuant to the Preliminary Injunction and Order of Seizure entered by the District Court for the District of New Jersey after Wrestlemania® XXIX.  WWE seized the merchandise from various cities on different dates, from different people and yet the artwork on the

**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.**

counterfeit merchandise was identical. WWE does not sell any merchandise that includes this artwork, so the designs were not copied from WWE. Based upon WWE's observation of the unauthorized merchandise sold at WWE live events and the common designs of the merchandise, I believe that the unauthorized merchandise being sold at WWE's live events throughout the country emanates from only a few sources.

30.     WWE is currently promoting and will be presenting a multi-city presentation of live wrestling entertainment events throughout the United States and in many other cities throughout the world beginning on March 26, 2015 and ending on March 28, 2016 (WWE's final live event before Wrestlemania® 32) ("WWE's 2015-2016 Live Events"). WWE's 2015-2016 Live Events include its Wrestlemania® 31 weekend from March 26 through March 30, 2015 in Santa Clara and San Jose, California. WWE's Wrestlemania® 31 weekend will consist of various events taking place in Santa Clara and San Jose, California, including, but not limited to, (1) WWE's Wrestlemania® Axxess event at the San Jose Convention Center from March 26 through March 29; (2) WWE's NXT live event at San Jose University on March 27; (3) WWE Studios' world premier movie screening at Camera 12 Theater on March 27; (4) WWE's Hall of Fame event at the SAP Center on March 28; (5) WWE's Wrestlemania® 31 event at Levi's Stadium on March 29; and (6) WWE's Monday Night Raw event at the SAP Center on March 30 (collectively, the "Wrestlemania® 31 Weekend Events").

31.     The operation of the WWE's 2015-2016 Live Events, including the Wrestlemania® 31 Weekend Events, will include, as in the past, offering for sale souvenirs, merchandise and memorabilia bearing trademarks, service marks and logos of WWE (the "WWE Marks"). The WWE live events in past series have attracted, and are certain to continue attracting, the attention of dealers and vendors of merchandise bearing counterfeits of the WWE Marks.

32.     I understand that the gross dollar volume of goods bearing the WWE Marks that will be sold at WWE's 2015-2016 Live Events is expected to exceed twenty ($20) million dollars.

**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.**

33. Based on my experience detailed above, I expect individuals and groups (hereinafter "Counterfeiters") who, without permission or authorization, misappropriate the WWE Marks for use on counterfeit merchandise (the "Counterfeit Merchandise") to be selling Counterfeit Merchandise at WWE's 2015-2016 Live Events, including at the Wrestlemania® 31 Weekend Events from March 26 through March 30, 2015, and I have no reason to believe that they will not be doing so.

34. Based on my experience, the Counterfeiters sell to the general public to cash in on the enormous commercial value and goodwill contained in, and conveyed by, the WWE Marks. The Counterfeit Merchandise will consist of similar designs that appear at different cities throughout the United States, indicating that the Counterfeit Merchandise is emanating from a common source. In fact, some Counterfeit Merchandise display the dates of various WWE live events making it simple for the Counterfeiters to use the same Counterfeit Merchandise at various WWE live events across United States.

35. Based on my past experience and the activity that I understand has been occurring at recent WWE live events, the Counterfeiters will travel from city to city selling Counterfeit Merchandise at WWE events. For example, two Defendants in the 2012 case before the Southern District of Florida, Thomas Keane and "Butch" Thomas Ingram, had been previously served at Wrestlemania® XXIV in Orlando, Florida in April 2008, pursuant to an ex parte TRO and seizure order from the District Court for the Middle District of Florida (Case No. 6:08-cv-00418-JA-GJK). In addition, two Defendants in the 2014 case before the Eastern District of Louisiana had been previously served in a different state entirely -- at Wrestlemania® XXVIII in Miami, Florida in 2012 pursuant to an ex parte TRO and seizure order from the District Court for the Southern District of Florida (Case No. 1:12-cv-21018-PAS). None of these Defendants ever made an appearance in court to contest the seizure or otherwise respond to WWE's allegations.

36.     Based on WWE's enforcement of prior Seizure Orders, I and other WWE employees have inspected unauthorized merchandise sold by Counterfeiters. The design, materials and quality of all of the unauthorized merchandise sold by the Counterfeiters is poor and generally uniform from item to item. None of the Counterfeit Merchandise bears a WWE label, or any other indicia of authenticity.

37.     Sales of goods bearing counterfeit marks reduce the demand for genuine goods and result in lost sales to WWE that can never be recouped because (a) the Counterfeiters have no regular place of business; and (b) the identity of itinerant Counterfeiters cannot readily be ascertained, and therefore Counterfeiters are not subject to ordinary legal remedies

38.     Based on my firsthand experiences described above, there is no doubt that the Temporary Restraining Order and Seizure Order now requested by WWE will be essential tools in retaining control over the unlawful distribution and sale of Counterfeit Merchandise during the Wrestlemania® 31 Weekend Events in Santa Clara and San Jose, California. I fully believe that the large-scale counterfeiting activities that I witnessed in East Rutherford, Miami and Atlanta, which would have proceeded largely unabated if WWE had been denied the protections of the Temporary Restraining Orders and Orders of Seizure, will reoccur in Santa Clara and San Jose. Indeed, attached hereto as Exhibit 5 are photographs of shirts bearing WWE live event tour dates that WWE has already encountered in various cities and states across the United States. Thus, I believe the orders are necessary to enable WWE to effectively coordinate and execute its efforts to protect its genuine trademarks.

39.     Based on my firsthand experiences in New Orleans, East Rutherford, Miami and Atlanta and WWE's prior experiences, the Counterfeiters are part of one or more nationwide counterfeiting rings wherein large volumes of counterfeit merchandise is created in advance of a WWE pay-per-view event, such as the upcoming Wrestlemania® 31 event in Santa Clara and San

Jose. After the pay-per-view event has ended, the Counterfeiters will travel to upcoming WWE live events in other parts of the United States with the remaining counterfeit merchandise, setup at these live events and continue to sell the counterfeit merchandise. They will also continue to produce and sell new WWE-branded counterfeit merchandise.

40. As described above, the Counterfeiters that WWE has encountered distribute and sell Counterfeit Merchandise at event venues, in surrounding parking lots, on surrounding streets and in local areas where WWE fans are likely to be, such as local area hotels. At many venues, for example, traffic backs up before and after the event as attendees approach and leave the venue and its parking areas. To avoid enforcement near the venue, Counterfeiters distribute and sell Counterfeit Merchandise on foot to customers in cars waiting in these traffic back-ups.

41. In addition, Counterfeiters typically peddle Counterfeit Merchandise at subway, train and shuttle bus stations where they know people will be awaiting transportation to and from the live event venues. Therefore, allowing WWE to seize Counterfeit Merchandise within a radius of five mile of each venue will greatly increase the success of WWE's trademark enforcement and anti-counterfeiting efforts.

42. In order to effectively protect WWE's rights, it is necessary for trademark enforcement efforts to begin the day before the actual events that will be the focus of Counterfeiters' infringing activities. Based on my experience, I believe that Counterfeit Merchandise will often begin to enter the local areas in large amounts the day before each event. Therefore, to most effectively protect WWE's rights, the trademark enforcement efforts, including the investigation of likely manufacturing, distributing and retail locations and the identification of persons and equipment being used to transport Counterfeit Merchandise from manufacturers to retailers and peddlers, should begin at least 24 hours before each event.

43. Similarly, it is necessary for trademark enforcement efforts to continue through the

DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.

day following the actual events that will be the focus of Counterfeiters' infringing activities. Based on my experience, I believe that Counterfeiters often will gather the next day to distribute Counterfeit Merchandise and coordinate further counterfeiting activity. Therefore, to most effectively protect WWE's rights, the trademark enforcement efforts, including the investigation of likely manufacturing, distributing and retail locations and the identification of persons and equipment being used to transport Counterfeit Merchandise from manufacturers to retailers and peddlers, should continue at least 24 hours after each event.

44. Allowing WWE to seize counterfeit goods at and around live event venues enables WWE to discover and investigate at least, the local source manufacturers and distributors of Counterfeit Merchandise.

45. As a result of its ability to seize Counterfeit Merchandise at live events, WWE successfully has avoided live event sales that otherwise would have resulted from the distribution of Counterfeit Merchandise by a given source. Enforcement in this manner is the optimal, most judicially and practically efficient means of combating merchandise counterfeiting, and it is possible only via the ex parte seizure process.

46. As demonstrated, the ex parte seizure process has aided WWE tremendously in bringing counterfeiting under a measure of control, and any hopes of WWE retaining such control over the unlawful distribution and sale of Counterfeit Merchandise at live events and elsewhere, and thereby effectively protecting its intellectual property rights, rests upon the continued availability of ex parte seizure relief.

47. I understand that of the scores of Counterfeiters served under various orders of seizure in the past, very few identified themselves, and not a single one made an appearance, much less registered an objection with the court in connection therewith. It is my understanding that

**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.**

Counterfeiters who have been caught prefer instead to turn over their illegal merchandise and lie low until a WWE live event in the future, hoping next time to evade enforcement.

48.     Genuine WWE goods are of the highest quality and grade and all such authentic WWE Merchandise bears an official label or other indicia of authenticity. Counterfeit Merchandise does not. It is typical for the goods bearing counterfeit marks to be lower in price and quality than goods bearing genuine marks. Because the quality of materials used by the Counterfeiters is not and cannot controlled by WWE, I understand that there is a safety risk to the public with regard to the materials that are actually used to manufacture the Counterfeit Merchandise (e.g., the Counterfeit Merchandise does not meet flammability standards). In addition, as a large percentage of the Counterfeit Merchandise is child-sized, there is a particular safety risk to children for whom parents might unknowingly purchase these inferior quality and potentially dangerous shirts.

49.     If Counterfeiters are permitted to sell goods bearing counterfeit marks, WWE will be irreparably harmed by the inferior quality counterfeit merchandise, as (i) WWE's reputation for the manufacture and sale of only the highest quality souvenirs, merchandise and memorabilia will be tarnished, and (ii) the company's well-established and invaluable customer goodwill and confidence will be eroded.

50.     Indeed, unless goods bearing counterfeit marks are seized from the Counterfeiters, such goods will enter the marketplace to the permanent, irreparable detriment of WWE and pose a safety risk to the public.

51.     If the Counterfeiters are alerted to the existence of this action or WWE's motion for Temporary Restraining Order and ex parte Seizure Order, I believe they will conceal or otherwise render the goods bearing counterfeit marks inaccessible to the Court but still available for future distribution and sale.

1         I declare under penalty of perjury that the foregoing is true and correct.

2

3   Executed this 16 day of March, 2015 in Stamford, Connecticut.

4

5                                    _____
                                     Lauren Dienes-Middlen

6                                    Vice President, Legal and Intellectual Property
                                     Business and Legal Affairs

7                                    World Wrestling Entertainment, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

14

**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.**

# EXHIBIT 1

# BEFORE WRESTLEMANIA EVENTS:

In the middle of March 2013, we encountered the following shirts during our live events in Pittsburgh, PA and Cincinnati, OH:



(Back of shirt)

(Front of shirt)

This shirt was also being sold in New Jersey during the WrestleMania Events.

# BEFORE WRESTLEMANIA EVENTS:

On Sunday, March 31, 2013, we encountered the following shirts during our live event in White Plains, NY:



(Back of shirt)



(Front of shirt)

# DURING WRESTLEMANIA EVENTS:

#1: Seized from Herbert Reid, from Schenectady, NY (he was served):



(Back of shirt)



(Front of shirt)

**60 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

#3: Seized from John Doe (he was served):



(Front of shirt)

(Back of shirt)

5 Shirts Seized

# DURING WRESTLEMANIA EVENTS:

#5: Seized from Byron Douglas, from Brooklyn, NY (he was served):



(Back of shirt)



(Front of shirt)

**3 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

## Seized from many different John Does (would not accept service):



(Back of shirt)



(Front of shirt)

**Approx. 190 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

**Seized from many different John Does (would not accept service):**



(Back of shirt)



(Front of shirt)

**Approx. 30 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

*#2*: Seized from John Doe (he was served):



(Front of shirt)



(Back of shirt)

**4 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

#4: Seized from John Doe (he was served):



(Back of shirt)



(Front of shirt)

**6 Shirts Seized**

# DURING WRESTLEMANIA EVENTS (at Raw on 4/8/13):

#7: Seized from Christopher Huff (he was served):



(Back of shirt)



(Front of shirt)

## 20 Shirts Seized

# DURING WRESTLEMANIA EVENTS (at Raw on 4/8/13):

#8: Seized from Scott Dreger, from Springfield, PA (he was served):



(Back of shirt)



(Front of shirt)

**21 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

**Seized from many different John Does (would not accept service):**



(Back of shirt)



(Front of shirt)

**Approx. 40 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

**Approx. 15 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

## Seized from many different John Does (would not accept service):



(Back of shirt)



(Front of shirt)

**Approx. 50 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

#6: Seized from Victor William Pritchard, from Orange, CA (he was served):







## 28 Poster Boards Seized

# DURING WRESTLEMANIA EVENTS:

#9: Seized from William S. Brown, from Middletown, CT (he was served):







**103 DVD Sets Seized (2,042 Discs Seized)**

# DURING WRESTLEMANIA EVENTS:

#10: Seized from Kenneth Asal, from East Berlin, CT (he was served):







## 11 Action Figures Seized

# WRESTLEMANIA EVENTS SEIZURE TOTALS

| Description | # Seized | Value |
|---|---|---|
| Shirts | 440 ($20 each) | $8,800.00 |
| Poster Boards | 28 ($25 each) | $700.00 |
| Action Figures | 11 ($30 each) | $350.00 |
| DVDs | 103 DVD Sets = 2,042 DVDs | Value of $52,000.00 |
| | 2,491 units | |

# EXHIBIT 2

# World Wrestling Entertainment

## WrestleMania Events

## 2012

## Enforcement Results

# WRESTLEMANIA 2012 – 78,363 attendees
### (Sun Life Stadium's largest attended event in history)



# There was an extremely large police presence at all events:






# And on the roads leading to the events as well:





# Counterfeiters were found selling bootleg merchandise

Fan Parking Lot

WrestleMania Axxess venue

Bootleggers were selling here



I was able to take a
a photo of one
counterfeiter selling
shirts on the path
leading from one fan
parking lot to
WrestleMania
at Sun Life Stadium....



Counterfeit shirts were also being sold in the parking lots and areas outside the stadium...

