1  MATTHEW G. BALL (SBN 208881)
   matthew.ball@klgates.com
2  K&L GATES LLP
   4 Embarcadero Center, Suite 1200
3  San Francisco, CA 94111
   Telephone: 415.882.8200
4  Facsimile: 415.882.8220

5  Jerry S. McDevitt (*pro hac vice* motion to be filed)
   Curtis B. Krasik (*pro hac vice* motion to be filed)
6  Christopher M. Verdini (*pro hac vice* motion to be filed)
   K&L Gates LLP
7  K&L Gates Center
8  210 Sixth Avenue
   Pittsburgh, Pennsylvania 15222
9  Telephone: (412) 355-6500
   Facsimile: (412) 355-6501
10

11 **Attorneys for Plaintiff World Wrestling
   Entertainment, Inc.**

12

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15 WORLD WRESTLING                         Case No. CV 15-1263
   ENTERTAINMENT, INC.,
16
                                           **SUPPLEMENTAL MEMORANDUM OF
17         Plaintiff,                       POINTS AND AUTHORITIES IN
                                           SUPPORT OF PLAINTIFF'S EX PARTE
18      vs.                                MOTION FOR TRO; ORDER FOR
                                           SEIZURE OF COUNTERFEIT MARKED
19 JOHN AND JANE DOES 1-100,               GOODS; AND ORDER TO SHOW CAUSE
   and XYZ CORPORATIONS 1-100,             WHY A PRELIMINARY INJUNCTION
20                                         SHOULD NOT ISSUE**
21         Defendants.

22

23

24

25

26

27

28

FILED

MAR 9 3 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  Pursuant to the Court's request at the March 23, 2015 hearing on Plaintiff World Wrestling

2  Entertainment, Inc.'s ("WWE") Ex Parte Motion for Temporary Restraining Order, Order for

3  Seizure of Counterfeit Marked Goods and Order to Show Cause Why a Preliminary Injunction

4  Should Not Issue, WWE hereby respectfully submits this supplemental memorandum of law

5  addressing the issue of whom should have authority to seize counterfeit merchandise pursuant to 15

6  U.S.C. § 1116(d) (the "Act") and the scope of the bond requirement.

7  **I.  Off-Duty Officers Should Be Permitted to Serve the TRO and Seize Counterfeit**

8  **Merchandise at the WWE Wrestlemania Weekend Events.**

9  As set forth in the legislative history for the Act, both the House and Senate committees

10  recognized that limiting service and seizure to Federal law enforcement officers would defeat the

11  purpose of the Act because of the multitude of responsibilities that, for example, U.S. Marshals have

12  in connection with criminal matters. *See* S. Rep. No. 98-526 at 12 (attached hereto as Exhibit 1);

13  H.R. Rep. No. 98-997 at 19 (attached hereto as Exhibit 2). As a result, the Act expressly permits

14  service and seizure by state and local law enforcement officers. 15 U.S.C. § 1116(d)(9). Section

15  1116(d)(9) provides in pertinent part "[t]he court shall order that service of a copy of the order under

16  this subsection shall be made by a Federal law enforcement officer (such as a United States marshal

17  or an officer or agent of the United States Customs Service, Secret Service, Federal Bureau of

18  Investigation or Post Office) or may be made by a State or local law enforcement officers, who,

19  upon making service, shall carry out the seizure under the order." Pursuant to the legislative history,

20  when the Court authorizes State or local law enforcement to carry out the service and seizure, the

21  Court has the authority to ensure that such State or local law officers uphold the Federal standards

22  for carrying out a seizure. H.R. Rep. No. 98-997 at 19.

23  The Act does not make any distinction between on and off-duty enforcement officers and

24  does not preclude, by its terms, the Court from authorizing off-duty enforcement officers to serve the

25  TRO and seize counterfeit merchandise. While WWE did not find any case that directly addresses

26  the issue, the legislative history focuses on "maintenance of public order" and restricting private

27  citizens who would have a personal interest in the matter from effectuating the seizure. *See* S. Rep.

28

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION FOR TRO; ORDER FOR SEIZURE OF COUNTERFEIT MARKED GOODS; AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

No. 98-526 at 12; *see also Warner Bros., Inc. v. Dae Rim Trading*, 877 F.2d 1120, 1125-26 (2d Cir. 1989) (a "compelling reason for the use of a public officer is that tradition and established law dictate that such drastic acts as seizure and impoundment be conducted by neutral and impartial persons."). Consistent with this purpose, WWE's roster of off-duty law enforcement officers are neutral and impartial persons in that none of them are WWE employees. *See* Supplemental Declaration of Lauren Dienes-Middlen. Thus, this case can be distinguished from *Time Warner Entm't co. v. Does*, 876 F. Supp. 407 (E.D.N.Y. 1994) wherein Time Warner sought to authorize a "private investigator" to "break into and enter defendants' premises (one of which was a home)" not officers of the law who are experienced in search and seizures.

Moreover, under California law, "it has been, and remains, the rule that peace officers, such as sworn personnel of the Los Angeles Police Department retain peace officer status and authority, both during and beyond regular duty hours." *Melendezv. City of Los Angeles*, 63 Cal. App. 4th 1, 8-9 (1998). Accordingly, an off-duty police officer from a local municipal police department should qualify as a "local law enforcement officer" under 15 U.S.C. Section 1116(d), especially because that statute makes no distinction in its langage between on- and off-duty personnel.[1]

In addition, in this instance there would not be any appreciable distinction between an off-duty and on-duty local law officer. An off-duty police officer for purposes of Fourth Amendment considerations and analysis to be acting as an agent or instrument of the government if he is functioning as a police officer or "the government was aware of and acquiesced to the conduct" and the off-duty officer was "assisting the police." *See, e.g., U.S. v. Couch,* 378 F. Supp. 2d 50, 55-57 (N.D.N.Y. 2005) (collecting cases). By analogy, an off-duty police officer enforcing the Court's

[1] The *Melendez* case also discusses California Penal Code § 70, which governs when peace officers who work as private security guards have the authority and protection given to peace officers in their usual, public work. *E.g.*, 63 Cal. App. 4th at 13. The *Melendez* case holds that peace officers who work as private security guards only have such authority and protections when they meet the requirements of California Penal Code Section 70, which requires, among other things, that the peace officer be in uniform. *Id.*; Cal. Penal Code Section 70. Here, the off-duty law enforcment officers would not be in uniform. *Suppl. Dienes-Middlen Decl.* However, the language of Section 1116(d)(9) does not require "local law enforcement officer[s]" to be entitled to the authority and protections that would be due them during execution of their public work. Section 1116(d)(9) merely states that this Court shall order service to be made and seizure to be done by a "local law enforcement officer."

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION FOR TRO; ORDER FOR SEIZURE OF COUNTERFEIT MARKED GOODS; AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

TRO and Seizure Order would be acting an arm of the Court and would be subject to the Fourth Amendment scrutiny. To allay any concerns from the Court, WWE does not have any objection to expressly requiring that each off-duty officer, before serving the TRO and seizing any goods, identify him or herself as such. *Suppl. Dienes-Middlen Decl.* Similarly, to allay the Court's concerns, WWE does not have any objection to expressly require each off-duty officer to be armed, or unarmed, while serving the TRO and seizing any goods.[2] *Id.*

Further, pursuant to the Court's instructions, included in the Supplemental Dienes-Middlen Declaration is: (a) a list of the off-duty law enforcement personnel who will participate in the seizure process, assuming that the Court finds that it is appropriate for off-duty personnel to do so; (b) a statement as to whether any of the off-duty personnel are on restricted duty due to alleged misconduct; and (c) whether any of the off-duty personnel were subject to any disciplinary proceedings or misconduct complaints, and, if so, what was the outcome of those proceedings or complaints. *Suppl. Dienes-Middlen Decl.*

## II. The Bond Amount Need Only Be Be Sufficient to Cover Damages from a Wrongful Seizure

At this morning's hearing, the Court also raised concerns concerning the size of the bond, and suggested that the bond needed to be large enough to cover, for example, damages suffered by bystanders at the hands of unintentional conduct by off-duty law-enforcement officers. However, the statutory language and legislative history of the Lanham Act makes clear that this is not the purpose of the bond. Section 1116(d)(4)(A), the section of the seizure provisions of the Lanham Act that deals with bonds provides as follows : "the person obtaining an order under this subsection provides the security determine adequate by the court for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure or wrongful attempted seizure under this subsection." As the legislative history reflects, the amount of the security bond should be adequate to compensate the defendant if awarded damages pursuant to 1116(d)(11). H.R. Rep. No.

---

[2] WWE was not able to locate California statutory authority that required off-duty State or local law enforcement officers to be armed, or that addressed whether off-duty State or local law enforcement officers could or could not identify themselves as off-duty law enforcement officers while executing the a seizure order.

1  98-997 at 19. Section 1116(d)(11) provides for damages by reason of a wrongful seizure including

2  "lost profits, cost of materials, loss of good will . . .," i.e., related to damages for merchandise

3  wrongfully sezied. While "wrongful seizure" is not defined in the Act, "Congress did list some

4  "rules of thumb": that a few legitimate items were seized does not make the seizure as a whole

5  "wrongful"; a seizure will be "wrongful" if the applicant acted in bad faith in seeking it for improper

6  purposes such as preventing the sale of legitimate goods at discount prices; and a seizure will be

7  "wrongful" if the goods seized are legitimate merchandise, even if the plaintiff acted in good faith."

8  McCarthy on Trademarks § 30:44; *see also Waco Int'l, Inc. v. KHK Scaffolding Houston, Inc.*, 278

9  F.3d 523, 535-36 (5th Cir. 2002). Thus, the bond amount need to be adequate to cover damages that

10  could be sustained as a result from WWE seizing legitimate merchandise. While such instances are

11  extremely unlikely for the reasons explained in WWE's previous filings, the counterfeit merchandise

12  sold usually sells for approximately $10-20. Accordingly, WWE believes the bond should be no

13  more than $10,000.

## CONCLUSION

15  WWE believes that it is entitled to the relief requested for thre reasons stated above and in its

16  moving papers, but should the Court continue to disagree, WWE respectfully requests that the Court

17  issue the requested seizure order limited to law enforcement personnel.

Respectfully submitted,

K&L GATES LLP

Dated: March 23, 2015          By: _____

Matthew G. Ball
Jerry S. McDevitt (pro hac vice motion to be filed)
Curtis B. Krasik (pro hac vice motion to be filed)
Christopher M. Verdini (pro hac vice motion to be filed)

ATTORNEYS FOR PLAINTIFF WORLD
WRESTLING ENTERTAINMENT, INC

# REPORT

[To accompany S. 875]

The Committee on the Judiciary, to which was referred the bill (S. 875) to strengthen the laws against trafficking in counterfeit goods and services, and for other purposes, having considered the same, reports favorably thereon, with an amendment in the nature of a substitute, and recommends that the bill, as amended, do pass.

## I. PURPOSE

Under Federal law today, there are virtually no criminal penalties for the sale of goods and services through the use of false trademarks. The absence of such penalties, and the lack of sufficiently stiff civil sanctions, has emboldened counterfeiters, who now defraud consumers out of billions of dollars each year in the United States alone. S. 875 is designed to provide both Federal prosecutors and trademark owners with essential tools for combating this insidious and rapidly growing form of commercial fraud.

S. 875 provides for criminal penalties of up to 5 years imprisonment and up to $250,000 in fines for individuals and up to $1,000,000 in fines for corporations and similar legal entities that intentionally traffic in goods or services knowing them to be counterfeit. The bill also authorizes the owner of a registered trademark to bring a civil suit for treble damages against those who violate this provision.

As counterfeiters have built larger and more professional enterprises, they have become increasingly callous towards the judicial process. In particular, once given warning that a trademark owner has discovered their illegal operation, many counterfeiters will simply destroy or conceal their illegal merchandise before any

[2]

court can examine it. To provide trademark owners with an effective means of combatting this lawless behavior, the bill provides that under certain defined circumstances, a private party may obtain a court order to seize counterfeit goods without giving advance notice to the defendant. Since reputable businesses would not be likely to destroy or conceal merchandise if given notice of court proceedings, the bill would not permit issuance of *ex parte* seizure orders against such business except in unusual circumstances. In addition, the bill provides numerous safeguards to ensure that *ex parte* seizures are not abused.

## II. SUMMARY OF S. 875

S. 875 provides several vital weapons to help combat the mushrooming traffic in counterfeit goods and services. First, the bill authorizes courts to impose criminal penalties upon persons who intentionally traffic or attempt to traffic in goods and services knowing them to be counterfeit. Under the bill, an individual found guilty of counterfeiting goods or services could be sentenced to up to 5 years in prison, and to a fine of up to $250,000, or both; a corporation or other legal entity could be fined up to $1,000,000.

A manufacturer or merchant may recognize in advance that a mark he or she wishes to use might be thought to conflict with a registered trademark. To provide persons in this position with a "safe harbor" from criminal liability, the bill provides that none of the penalties of S. 875 shall apply to a person who (1) notifies the trademark registrant 30 days before its use of his or her intention to use a particular mark, and (2) properly labels his or her goods or other materials to prevent consumer deception.

Although the criminal sanctions of the bill are vital, it is unlikely that busy Federal prosecutors will be able to prosecute more than a fraction of those who traffic in known fakes. To encourage private enforcement of the bill, and to provide a strong deterrent to those who contemplate entering or continuing this illegal trade, the bill authorizes trademark owners to bring suit against trademark counterfeiters for treble damages. Although treble damages are available under the Trademark Act of 1946 *(15 U.S.C. 1051 et seq.)* (hereinafter "Lanham Act") on a discretionary basis, some courts have declined to award treble damages even in egregious cases of counterfeiting. Since counterfeiting is a uniquely pernicious form of trademark infringement, section 2320(d) of the bill entitles a plaintiff to an automatic award of the greater of treble damages or treble the defendant's profits if he or she can show

that the defendant has intentionally trafficked in goods or services knowing them to be counterfeit. Successful plaintiffs would also be automatically entitled under the bill to an award of costs, attorney's fees, and investigator's fees.

To ensure that plaintiffs can effectively enforce their rights under the bill, section 2320(f)(1) provides that under certain defined circumstances, plaintiffs may obtain court orders directing law enforcement officials to seize counterfeit goods without giving advance notice to the party from whom the goods are seized. The reason for this provision is that many counterfeiters, once given notice that their fraudulent operations have been discovered, will

[3]

immediately dispose of the counterfeit goods and make it impossible for the trademark owner ever to bring them to justice.

Before a court may issue an *ex parte* seizure order, it must find, based on sworn affidavits, that a sufficient basis exists for concluding that counterfeit goods are located at the described location, and that the plaintiff will be irreparably harmed

if the goods are not seized on an *ex parte* basis. In addition, a party seeking an *ex parte* seizure order must post a bond in an amount specified by the court. Any party subjected to a wrongful *ex parte* seizure will be able to collect damages from the party that sought the seizure.

The Committee wishes to emphasize what is *not* covered by the present bill. First, because the bill addresses only the use of spurious marks that are "identical to or substantially indistinguishable from" a registered mark, it does not reach routine business disputes about arguable instances of trademark infringement. For example, the bill does not reach disputes over similar, but readily distinguishable, marks. Second, it does not include within its coverage so--called "gray market" goods----i.e., authentic trademarked goods that have been obtained from overseas markets. The importation of such goods is legal under certain circumstances. For example, the Treasury Department has long interpreted section 526 of the Tariff Act of 1930, *19 U.S.C. 1526,* to permit the importation of such goods when the foreign and domestic users of the trademark are affiliated through common ownership and control. *See 19 C.F.R., 133.21(c).* In any event, since the trademarks on "gray market" goods are placed there with the permission of the trademark owner or of a party affiliated with the Committee does not consider such goods counterfeit for purposes of this legislation. Third, the bill does not extend to imitations of trade dress or packaging, unless those features have been registered as trademarks on the principal register in the U.S. Patent and Trademark Office. Finally, the bill does not reach private individuals who knowingly purchase counterfeit goods or services solely for their own personal use. The Committee believes that any trademark issues that may arise with regard to the above practices can best be dealt with by way of the ordinary civil remedies of the Lanham Act.

The bill is not intended to be used, nor is it likely to be used, to facilitate or enforce any system of resale price maintenance. In particular, the Committee does not intend the procedures provided by this bill to be used to harass merchants who sell legitimate trademarked goods or services at discount prices. Any party that brings suit under the bill for this purpose, or otherwise in bad faith, will be liable in damages, including punitive damages, to the victimized defendant.

III. DISCUSSION

Trademarks play a vital role in all but the most primitive societies. For consumers, who cannot investigate the merits of every product they buy, trademarks provide a uniquely reliable source of information about potential purchases. For manufacturers, trademarks crystallize the reputation that they built up in the past and ensure that satisfied customers will know where to come back for more.

[4]

Trademark counterfeiting----that is, selling or otherwise trafficking in goods or services through the use of spurious trademarks----poisons this crucial information system. It defrauds purchasers, who pay for brand--name quality and take home only a fake. It cheats manufacturers of sales that their reputation has earned them, and tarnishes that reputation when the manufacturers are blamed for the flaws of goods they did not produce. Finally, it

injures unwitting retailers, who must face the ire of customers who discover that their "brand name" purchases are in fact counterfeits.

It is obviously impossible to determine with precision the extent of commercial counterfeiting. However, Gerald J. Mossinghoff, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, testified before the Committee that "it is generally believed that several billion dollars of counterfeit goods are sold annually." *Trademark Counterfeiting Act of 1983*, Hearings on S. 875 before the Subcommittee on Patents, Copyrights and Trademarks of the Senate Committee on the Judiciary, 98th Cong., 1st Sess. 15 (1983) (hereinafter cited as *1983 Hearings*). But the losses to victims of counterfeiting are not fully encompassed by sales statistics. A defective counterfeit part may hobble a machine far more valuable than the part itself, and a manufacturer whose good name is injured through the sale of inferior products bearing its trademark may lose much additional business as a result.

Counterfeiters have long plied their trade by sewing false brand name labels into cheaply manufactured clothing. In recent years, however, they have vastly expanded the scope of their operations. The Committee heard considerable testimony and saw substantial evidence that counterfeiters now traffic in automobile parts, cosmetics, fertilizers, chemicals, perfumes, watches, luggage, sporting goods, electronic equipment, computer components, medical devices, and numerous other items. No industry is immune to this form of fraud.

The damage done by counterfeiting often goes beyond mere economic injury. Many counterfeiters today sell products that pose a serious threat to public health and safety. In 1977, for example, the Federal Aviation Administration discovered and ordered the immediate removal of shoddily manufactured "Being" fire detection systems potentially affecting up to 100 aircraft. Counterfeit brake parts have caused fatal automobile accidents; counterfeit heart pumps have been sold to

more than 200 hospitals throughout the country; and counterfeit drugs are believed to have killed more than a dozen people. For a fuller description of these and other incidents, *see* Rakoff & Wolff, *Commercial Counterfeiting and the Proposed Trademark Counterfeiting Act, 20 Am. Crim. L. Rev. 145, 149--54 (1982).*

One of the most dramatic examples of the risks to human life that commercial counterfeiting can pose is described in the decision of a Federal district court in the case of *Textron v. Aviation Sales*, Civ. 77--1317 (C.D. Cal. Sept. 30, 1980). In that case, the court found that the defendants had manufactured and sold helicopter parts falsely bearing the registered trademark of the Bell Helicopter division of Textron, Inc. The court found that the counterfeits were critical \*\*\* parts whose failure would result in the in flight loss

[5]

of control of the helicopter," and that the parts "were defective, not airworthy, and created a grave risk to human life and safety." Slip op. at 5. The tragic result, that court found, was that "[s]everal helicopters have crashed resulting in injuries and death as a result of the failure of these parts manufactured and sold by the defendants." *Id.*

Although the Lanham Act provides for civil penalties for all forms of trademark infringement, including international trafficking in known counterfeits, penalties under the Act have been too small, and too infrequently imposed, to deter counterfeiting significantly. Indeed, many counterfeiters view potential civil penalties simply as a cost of doing their illegal business----a cost they can well afford, given the enormous profits to be made by capitalizing on the reputations, development costs, and advertising efforts of honest manufacturers at little expense to themselves.

Certain Federal criminal laws, such as those relating to mail and wire fraud, *18 U.S.C. 1341--43*, arguably apply to some instances of trademark counterfeiting. However, prosecutors have been understandably reluctant to bring prosecutions under these broadly worded laws. Nor have State anti--counterfeiting statutes proven effective; most such statutes treat counterfeiting as a misdemeanor, and have been little enforced. See Rakoff & Wolff, *supra*, 20 Am. Crim.
L. Rev. at 168--69. Able to reap huge profits at little expense, and facing neither criminal sanctions nor substantial civil penalties, counterfeiters have built steadily larger illegal enterprises. Indeed, many have integrated their counterfeiting operations with their other criminal activities. For example, Captain Arthur Katz, Commanding Officer of the Safe, Loft, and Truck Squad of the New York City Police Department, testified that "the same outlets

that deal in stolen merchandise often sell spurious products." *1983 Hearings, supra,* at 58.

To help stem what the Court of Appeals for the Second Circuit has described as an "epidemic" of commercial counterfeiting, *Montres Rolex S.A. v. Snyder, 718 F2d 524, 528 (2d Cir. 1983), cert. denied, 104 S. Ct. 1594 (1984),* S. 875 provides for stiff criminal penalties for those who intentionally traffic in goods or services knowing them to be counterfeit. Individuals would be subject to up to 5 years in prison and to a fine of up to $250,000, while corporations and other legal entities such as partnerships could be fined up to $1,000,000. Of course, a person who trafficked in counterfeit goods or services without the mental state required by this bill might still be civilly liable under the Lanham Act or similar State statutes, which do not require proof of the defendant's state of mind.

In addition to criminal penalties, the bill would increase the damages available to victims in civil suits against counterfeiters. Under the Lanham Act, a successful plaintiff may recover (1) defendant's profits, (2) any damages the plaintiff has sustained, and (3) the costs of the action. *See 15 U.S.C. 1117.* A court may in its discretion award up to three times the plaintiff's actual damages and, in "exceptional cases," reasonable attorney's fees. *Id.* Although some courts have awarded treble damages under the Lanham Act, others have declined to do so even in cases of deliberate counterfeiting. For example, in *Playboy Enterprises v. Baccarat Clothing Co., 692 F.2d 1272 (9th Cir. 1982),* the Court of Appeals

[6]

found that "the defendants were guilty of willful trademark infringement" in selling counterfeit clothing, but nevertheless declined to direct the district court to award the plaintiff more than actual damages. *Id. at 1276.* The bill would therefore make an award of the greater of treble damages or treble the defendant's profits mandatory if the plaintiff can show that the defendant intentionally trafficked in goods or services knowing them to be counterfeit. A successful plaintiff would also be automatically entitled to an award of the costs of bringing the suit, including reasonable investigator's and attorney's fees.

There are two primary reasons the Committee believes that mandatory awards of treble damages (or profits) and costs are crucial to a successful fight against counterfeiting. First, such awards will significantly deter those who might otherwise engage in this fraudulent enterprise. As noted earlier, courts may in their discretion grant treble damages in any trademark infringement case. However, the statutory grant of authority to award such damages, 15 U.S.C. 1117, provides that treble damages "shall constitute compensation and not a penalty." This proviso is out of place in the context of commercial trafficking in known counterfeits, in which a financial penalty is entirely appropriate. This is especially so since for every counterfeiter who pays such a penalty, several may never be brought to justice. An award of treble damages will thus serve as a form of punitive damages, the appropriateness of which is well established in tort law for conduct involved egregious disregard for the rights of others. By taking the profit out of this lawless behavior, the Committee believes that the bill will offer a potent deterrent to counterfeiting.


A second reason for the mandatory imposition of treble damages and costs is that although the criminal provisions of the bill will aid significantly in the battle against counterfeiting, busy Federal prosecutors simply lack the resources to bring criminal charges against more than a fraction of trademark counterfeiters. Private businesses victimized by counterfeiting must therefore assume an important role in vindicating both their rights and the public interest in accurate trademark information. However, compiling evidence against clever counterfeiting rings and meeting this Act's burden of proof will often be difficult and risky. In addition, it is often hard for a plaintiff to prove more than a fraction of the losses that he or she has in fact incurred. To encourage private victims to provide needed enforcement of the bill's prohibition against counterfeiting, and to help make plaintiffs whole when they prove that a defendant has counterfeited the plaintiffs' goods or services, the bill therefore provides for a mandatory award of treble damages (or profits), and for an award of the costs of bringing the action, including reasonable investigator's and attorney's fees.

The bill also provides that under certain defined circumstances, a trademark owner may obtain a court order directing a law enforcement official to seize counterfeit goods and related materials without giving advance notice to the party from whom the goods are seized. *Ex parte* procedures of this sort, should, of course, be used with caution in civil cases. However, the Committee finds that trademark counterfeiting has become an increasingly professional operation, and that many of those who traffic in counterfeits have

become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon. Counterfeiters often operate in networks, and if any member of the network learns that his fraud has been discovered, he will immediately transfer the counterfeit goods to another member of the network for safekeeping. Alternatively, a counterfeiter may destroy the goods or secrete them elsewhere. *See Fimab--Finanziaria Maglificio Biellese Fratelli Fila v. Kitchen, 548 F. Supp. 248, 250 (S.D. Fla. 1982)* (" 'dumping' of counterfeit goods or transfer of counterfeit goods to unknown third parties *** is a common practice in the counterfeiting industry.").

By whatever means, many commercial counterfeiters will prevent the courts from effectively exercising their jurisdiction. A common result is that after giving a counterfeiter notice of an upcoming hearing, the victimized plaintiff will be met in court with a version of the following refrain: "I bought only a few pieces from a man I never saw before and whom I have never seen again. All my business was in cash. I do not know how to locate the man from whom I bought and I cannot remember the identity of the persons to whom I sold." *In Re Vuitton et Fils, 606 F.2d 1,* (22d Cir. 1979). A "front line soldier" in the battle against counterfeiting who testified before the Committee, Mr. William C. Steffin of the Los Angeles law firm of Lyon & Lyon, echoed this observation. He commented that in the absence of a seizure order, "[t]he results are predictable. You are shown the door, perhaps not too politely, and at the TRO hearing you will learn that the defendant had no goods or documents at the time the notice was given and, in fact, the only such goods he or she ever sold [were] the ones that your investigator bought." *Trademark Counterfeiting Act of 1982*, Hearing on S. 2428 before the Senate Committee on the Judiciary, 97th Cong., 2d Sess. 58, 60 (1982).

In the face of widespread use of such bad faith tactics, the Committee believes that the careful use of *ex parte* orders is fully warranted. As the Second Circuit Court of Appeals has noted, "If notice is required [in a trademark counterfeiting case], that notice all too often appears to serve only to render fruitless further prosecution of the action. This is precisely contrary to the normal and intended role of 'notice' and it is surely not what the authors of [*Rule 65 of the Federal Rules of Civil Procedure*] anticipated or intended." *Vuitton, 606 F.2d at 5.* Indeed, many Federal district courts now authorize *ex parte* seizures in certain trademark infringement cases brought under the Lanham Act. *See* Bainton, *Seizure Orders: An Innovative Judicial Response to the Realities of Trademark Counterfeiting, 73 Trademark Rep. 459, 463 n.11 (1983)*, reprinted in *1983 Hearings, supra*, at 120, and the lengthy compilation of cases therein.

The Committee recognizes, however, that *ex parte* seizures must be employed with caution. The bill therefore provides stringent safeguards against abuse of *ex parte* seizure orders. All protections afforded by the Federal Rules of Civil Procedure are explicitly incorporated. In addition, the bill provides for numerous specific protections. Thus, the bill specifies that no *ex parte* seizure order may be granted unless a less severe remedy would be inadequate. No such order may be issued unless the court finds a sufficient basis

for concluding that counterfeit goods or certain related materials are located at the place identified in a sworn affidavit provided by the applicant, and that the applicant will suffer immediate and irreparable injury if the goods or materials are not seized through an ex parte order. In addition, the applicant will be required to post a bond, in an amount determined by the court, to compensate the defendant should the seizure prove to have been wrongly ordered. The party whose goods are seized will have the right to a hearing, within 10 days of the seizure, concerning the legality of the seizure, and a right to damages if his or her possessions were wrongfully seized. Finally, orders may not be issued against defendants who have complied with the notice and labelling provisions of proposed subsection 2320(c), or against innocent publishers protected under 15 U.S.C. 1114(2). The Committee believes that these safeguards are fully adequate to satisfy the constitutional requirements of due process, in light of the extraordinary bad faith exhibited by many commercial counterfeiters, and the need for effective means of stemming the current epidemic of counterfeiting.

The Committee wishes to emphasize that is does not intend for *ex parte* seizures to be employed routinely or

casually. In particular, the Committee does not believe that it would be appropriate to issue an *ex parte* seizure order when the defendant is a reputable merchant, absent unusual circumstances. A reputable merchant would not be likely to destroy or conceal counterfeit goods or otherwise act to frustrate the court's jurisdiction, and an applicant would therefore ordinarily be unable to make the showing required by this bill for issuance of an *ex parte* seizure order against such a merchant. This general principle might be overridden, of course, if the applicant could make a particularized showing that the merchant would be likely to defy an ordinary court order----such as by demonstrating that the merchant had previously refused to comply with such orders.

The Committee strongly believes that the remedies provided by the bill must not be used as part of a scheme to control the resale prices of legitimate, non--counterfeit goods, or to prevent the sale of authentic goods intended for distribution in foreign markets but shipped by independent importers into the United States (so--called "gray market" goods). Should a party bring suit under the bill for these purposes or otherwise in bad faith, proposed subsection 2320(i) entitles the victimized defendant to an award of damages. If a party should obtain an *ex parte* seizure order in bad faith, subsection 2320(i) would provide the victim with a remedy as well. The victim of a bad--faith suit will be entitled to costs, attorney's fees, and investigator's fees. A court may also award punitive damages against a party that has engaged in such bad--faith tactics.

The Committee is particularly concerned that the procedures provided by the bill not be used by manufacturers to obtain the names of----and then retaliate against----middlemen who have provided legitimate goods to discount retailers. For this reason, the Act provides special protections for business records seized under the *ex parte* seizure provisions. In addition, subsection (g) of the bill directs courts to take ample precautions to ensure that the civil discovery process is not abused for this purpose.

[9]

### IV. HISTORY OF THE BILL

On April 22, 1982, in the Second Session of the 97th Congress, Senator Charles McC. Mathias of Maryland introduced S.2428, the Trademark Counterfeiting Act of 1982. *See* 128 Cong. Rec. 3913. The bill was referred to the Judiciary Committee, which held a hearing on the bill on September 15, 1982. The Committee heard testimony from the following witnesses; the Honorable William F. Baxter, Assistant Attorney General for the Antitrust Division, Department of Justice; Simon P. Gourdine, Commissioner, New York City Department of Consumer Affairs; Peter F. Jones, Senior Vice President, Levi Strauss & Co., and Chairman, International Anti--Counterfeiting Coalition; Vernon Venne, Senior Patent Attorney, Ashland Oil Co.; Raymond Fink, Attorney and Patent Counsel, Gates Corp.; Edward M. Brown, Manager, International Special Services, A. T. Cross Export Co.; and Seymour Merrall, Corporate Vice President for Administrative Services, Bausch & Lomb Corp.

In addition, the Subcommittee heard testimony from William C. Steffin, Esq., of the Los Angeles law firm of Lyon & Lyon; Jed Rakoff, Esq., of the New York City law firm of Mudge, Rose, Guthrie & Alexander; Thomas J. Corum, Esq., President, United States Trademark Association; Griffith B. Price, Jr., Esq., Chairman, Federal Legislation Committee, United States Trademark Association; David R. Haarz, Esq., Attorney for Trademark and Bankruptcy, K Mart Corp., on behalf of the Association of General Merchandise Chains; and Robert W. Steele, Esq., of the law firm of Howrey & Simon, Washington, D.C.

The present bill, substantially revised in light of the helpful testimony at the September hearing, was introduced by Senator Mathias on March 22, 1983, in the First Session of the 98th Congress. *See* 128 Cong. Rec. 3646. Judiciary Committee Chairman Strom Thurmond, Senator Howell Heflin, and Senator John Warner co--sponsored the bill. S. 875 was referred to the Judiciary Committee's Subcommittee on Patents, Copyrights and Trademarks, which held a hearing on the bill on September 14 1983. At the hearing, the Subcommittee heard testimony from the Honorable Gerald J. Mossinghoff, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks; A. Robert Stevenson, Vice President, Government and Public Relations, K Mart Corp.; Edward T. Borda, President, Association

of General Merchandise Chains; James Bikoff, President, International AntiCounterfeiting Coalition; Capt. Arthur Katz, Commanding Officer, Safe, Loft, and Truck Squad, New York City Police Department; Paul Haluza, Director of Government Relations and Public Affairs, Motor Equipment Manufacturers Association; and Charles Turner,

Engineering Product Manager, Edelman Division of Parker Hannifin Corp. The Subcommittee also heard additional testimony from Robert W. Steele, Esq., and from Jed S. Rakoff, Esq. The testimony of all of these witnesses has been taken into account in the final version of the bill.

On November 17, 1983, the Subcommittee unanimously approved the bill for reporting to the full Committee with an amendment in the nature of a substitute. On May 10, 1984, without objection, the Judiciary Committee ordered the bill favorably reported, as "amend

[10]

ed" by a new amendment in the nature of a substitute, by a voice vote, without objection.

Since the bill's introduction, the following Senators have requested that they be added as cosponsors: Senator Christopher Dodd, Senator Alan Simpson, Senator Lowell Weicker, Senator Pete Wilson, Senator Claiborne Pell, Senator Jesse Helms, Senator Frank Lautenberg, Senator John Chafee, Senator Chic Hecht, Senator Charles Percy, Senator Joseph Biden, and Senator James Abdnor.

## V. SECTION--BY--SECTION ANALYSIS

S. 875 adds a new section 2320 to title 18 of the United States Code, to provide for criminal sanctions and improved civil remedies for intentional trafficking in goods or services with knowledge that the goods or services are counterfeit. It also makes certain conforming changes to other sections of the United States Code.

*Section 1.* This section sets forth the short title of the bill: the "Trademark Counterfeiting Act of 1984."

*section 2. Subsections 2320 (a) and (b).* These subsections define the crime of intentionally trafficking in goods or services knowing that they are counterfeit, or attempting to do so, and establish maximum criminal penalties.

The maximum penalties provided are 5 years imprisonment and/or a $250,000 fine in the case of an individual, and a $1 million fine in the case of a person other than an individual. The Committee wishes to emphasize that the prison terms and fines specified in subsection (a) are maximum penalties, which it does not expect to be routinely imposed. The Committee believes, however, that a combination of appropriate prison terms and substantial fines will create a needed deterrent to trademark counterfeiting.

Together, subsections 2320 (a) and (b) define the conduct prohibited by this bill. Subsection 2320(a) forbids intentional trafficking or attempting to traffic in goods or services knowing tha they are counterfeit. Subsection (b)(1) defines "counterfeit goods or services" as goods or services on or in connection with which a spurious mark is used or intended to be used, when the spurious mark is identical to or substantially indistinguishable from either (1) a genuine mark registered on the principal register in the U.S. Patent and Trademark Office, or (2) a designation protected under section 110 of the Amateur Sports Act of 1978, and used without the consent of the U.S. Olympic Committee. This conduct is the most extreme form of trademark infringement: it involves knowing use of a spurious mark that is identical, or virtually identical, to a registered trademark or protected Olympic symbol. It should be noted, however, that subsection (b)(1)(A)(ii) provides that there will be liability for the false use of a registered mark under this bill only if a spurious mark is used on or in connection with goods or services for which the genuine mark is actually registered on the principal register of the U.S. Patent and Trademark Office, and is in use.

The precise definition of when a mark is "identical to or substantially indistinguishable from" a registered mark will need to be developed on a case--by--case basis by the courts. *Cf. Montres Rolex, supra, 718 F.2d at 530--32 (2d Cir. 1983).* Obviously, a requirement

[11]

that the two marks be absolutely identical would be overly strict. It would allow counterfeiters to escape liability for counterfeiting by modifying the registered trademarks of their honest competitors in trivial ways. However, the Committee does not intend that this bill treat as counterfeiting what would formerly have been arguable, although not clear--cut, cases of trademark infringement. For example, manufacturers of generic drugs may adopt a mark for their goods that is reminiscent of, although certainly not "substantially indistinguishable from," a trademark used by the original manufacturer of a drug. Thus, "Prastimol" might be used as the mark for a drug that is the chemical equivalent of a drug sold under the trademark "Mostimol." Whether or not this sort of imitation may violate provisions of the Lanham Act or other statutes, the Committee does not intend the present bill to reach this type of

case.

The Committee wishes to reemphasize several other categories of case that the present bill does not cover. First, the bill does not reach trafficking in authentic goods that have been obtained from overseas markets and imported into the United States----so called "gray market" goods or "parallel imports"----since the trademark on such goods was placed there with the authorization of the trademark owner or of a party affiliated with the trademark owner. The importation of these goods is legal under certain circumstances, and the Committee does not consider such goods counterfeit for purposes of this legislation. Second, the bill does not extend to imitations of features of trade dress or packaging----such as color, shape, and the like----unless those features have been registered as trademarks on the principal register in the U.S. Patent and Trademark Office and are in use. Third, the bill is not intended to reach private individuals who purchase counterfeit goods or services solely for their own personal use. The Committee believes that any trademark issues that may arise with regard to the above practices can best be resolved within the context of the Lanham Act and other pertinent statutes.

Subsection 2320(a) forbids intentional trafficking in goods or services when the defendant knows that the goods or services are counterfeit. Thus, the bill has two mental state requirements: first, that the defendant "intends" to traffic in goods or services, and second, that he or she "knows" that the goods or services are counterfeit. The requirement that the defendant's trafficking be "intentional" is intended to ensure that the bill will reach only persons who traffic in goods or services deliberately, or "on purpose."

The mental state standards chosen by the Committee are designed to ensure that no innocent person could be held liable under this bill. In choosing these standards, the Committee determined that a "reckless" standard would be too low. Such a test would permit a finding of liability even if the defendant did not intend to traffic in the goods or services in question, or did not know that the goods or services were counterfeit. The Committee believes that such instances should be dealt with through the ordinary remedies of the Lanham Act.

Whether or not the defendant knew that the goods or services at issue were counterfeit will be a question of fact in any individual case, and in a criminal prosecution, will have to be proved beyond a reasonable doubt. As used in this bill, "knowledge" means actual

[12]

knowledge that the goods or services are counterfeit, and the existence of such knowledge will be a question for the judge or jury to decide on the basis of all the evidence presented. For further discussion of the term "knowing," see the Judiciary Committee Report on the Criminal Code Reform Act of 1981, S. Rept. 97--307, 97th Cong., 1st Sess. 67--68 (1981).

The Committee wishes to emphasize, however, that a defendant cannot be charged with knowing that particular goods or services were counterfeit merely because he or she had a suspicion that the goods or services might be counterfeit----or because a trademark owner made an unsubstantiated allegation to the defendant that the goods or services are counterfeit. Such an allegation would be insufficient to generate a firm belief or awareness on the part of the defendant that the goods were counterfeit. Indeed, if a person has an honest, good--faith belief that the goods or services at issue are not counterfeit, he or she will not be liable under this bill. Thus, a manufacturer who believes in good faith that he or she has a prior right to use a particular mark, or that the mark does not infringe a registered mark, could not be shown to "know" that he or she is dealing in counterfeits.

As noted earlier, a determination of whether the defendant knew that the goods or services in question were counterfeit will depend on the facts and circumstances of each individual case. However, in view of the free flow of goods in the economy, and the availability of "gray market" goods, a trademark owner will not ordinarily be able to establish that a defendant knew that goods were counterfeit solely because the trademark owner informed the defendant that he or she had not sold the goods directly to the defendant.

The Committee wishes to emphasize that although the present bill does not reach innocent infringement, the Lanham Act and other statutes do not reach such cases. This bill is not intended to change in any way existing rules of liability under those laws.

At the suggestion of the Justice Department, the explicit "effect on interstate commerce" element of the original

draft of S. 875 was eliminated. The Department argued that the explicit inclusion of this element was unnecessary, since a Federal nexus exists in the fact that the marks protected are federally registered trademarks or Olympic symbols protected by a Federal statute. However, the Committee wishes to emphasize that the bill is intended to reach all trafficking in counterfeits that affects interstate commerce, including trafficking that is discovered in its incipiency, such as before counterfeit goods have left the factory.

*Subsection 2320(b)(2)* provides a definition of the term "traffic." That definition is largely derived from a related, recently enacted statute, the Piracy and Counterfeiting Amendments Act of 1982, now codified at *18 U.S.C. 2318*(b).

Subsection 2320(b)(1)(B). Section 110 of the Amateur Sports Act of 1978, 36 U.S.C. 380, affords certain Olympic symbols a status akin to federally registered trademarks. This subsection is intended to ensure that these symbols will receive the same protection under this bill as will federally registered trademarks, subject to the limitations specified in the Amateur Sports Act concerning the protectins afforded to those symbols.

[13]

*Subsection 2320(c).* A manufacturer or merchant may be in doubt about whether a mark that he or she plans to use will infringe the trademark rights of a current registrant. The Committee believes that a person in this position should be able to ensure----in advance----that he or she will not be at risk of liability under this bill. Therefore, this subsection outlines two steps that a person contemplating use of a particular mark may take to assure a "safe harbor" from civil or criminal liability. The first is service of actual written notice upon the trademark registrant at least 30 days before the party begins to use the mark. The second is labeling the goods or related materials to identify the manufacturer of the goods bearing the mark, and to disclaim any connection with the owner of the registered mark. If one has taken both of these steps, one will be immune from liability under this bill.

The notice and labeling procedure is, of course, optional and not mandatory. A party's failure to use the notice and labeling procedure is not evidence that he or she trafficked in particular goods or services knowing that they were counterfeit. Indeed, if one believes in good faith that one has a right to use a particular mark, then one will not have acted with "knowledge" that the goods or services in question are counterfeit, and will not be liable under this bill in any event. The "safe harbor" offered by this subsection, however, provides a specific method by which a merchant or manufacturer can be assured that he or she will not be subject to the penalties of this bill.

*Subsection 2320(c)(3).* Obviously, even after complying with the notice and labeling procedure, there is no insulation from liability if one deliberately defies a court order enjoining trafficking in particular goods or services. In addition, a defendant cannot avail himself or herself of this subsection merely because he or she *attempted* to serve notice upon the registrant; the defendant must actually have served the notice.

*Subsection(c)(4).* A person's use of the notice and labeling procedures of this bill does not exempt that person from liability under the Lanham Act or other Federal, State, or local laws. The Committee believes that courts must make an independent examination of whether a party has violated such laws, and does not intend the notice and labeling procedures to provide a generalized immunity from liability under those laws.

*Subsection 2320(d)(1).* This subsection authorizes a trademark registrant or the U.S. Olympic Committee to bring suit for treble damages or profits, and other relief, if he or she can establish, by a preponderance of the evidence, that the defendant violated proposed subsection 2320(a). A plaintiff who can make this showing will be entitled to three times his or her actual damages, or three times the defendant's profits, whichever is greater. In addition to an award of damages, a successful plaintiff under this bill will be entitled to recover the costs of investigating and prosecuting the suit, including reasonable investigator's and attorney's fees.

The term "registrant" is intended to be interpreted in the same way that it has been construed in connection with section 32 of the Lanham Act *(15 U.S.C. 1114*(1)) with respect to the standing of parties to bring suit. Thus, exclusive licensees would be permitted to

[14]

bring a civil action under this subsection if the registrant is also a party to the suit.

The elements of proof in a civil suit under this Act will be the same as in a criminal prosecution: the plaintiff must establish that the defendant intentionally trafficked or attempted to traffic in goods or services knowing them to be counterfeit. Of course, the standard of proof in civil case will be by a preponderance of the evidence, rather than beyond a reasonable doubt.

Subsection 2320(d)(2). This provision authorizes courts to award prejudgment interest to plaintiffs in suits brought under subsection 2320(d) of the bill, as well as to defendants whose goods have been wrongly seized (*see* subsection 2320(f)(3)), or who have been sued in bad faith under this section (*see* subsection 2320(i)). The purpose of this provision is to ensure that the injured party is in fact made whole by the relief he or she is granted, and to discourage dilatory tactics in litigation under this Act.

*Subsection 2320(d)(3).* A defendant who has already been criminally prosecuted, and found beyond a reasonable doubt to have engaged in trademark counterfeiting, should not be permitted in a later civil suit to contest the essential allegations of the criminal offense of which he or she has been convicted. This proviso is identical to that contained in the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. 1964*(d). However, nothing in this bill is intended to change the usual rules concerning the limited collateral estoppel effect in later litigation of a plea of *nolo contender* or of a guilty plea later withdrawn. *See* Rule 410, Federal Rules of Evidence Rule 11 (e)(6), Federal Rules of Criminal Procedure.

Subsection 2320(e). This subsection is intended to ensure that a defendant in a civil or criminal suit under this bill will be able to raise any relevant defense that he or she could raise in a suit under the Lanham Act. For example, if a trademark has been canceled or abandoned, a defendant would have a defense under the Lanham Act, see 15 U.S.C. 1115, and therefore under this bill. The Committee intends to incorporate not only relevant defense that are explicitly provided for in the Lanham Act, but also relevant defense that the courts may recognize in their interpretation of that Act.

*Subsection 2320(f).* This subsection is intended to provide victims of trademark counterfeiting with essential litigation tools for bringing to justice persons who traffic in counterfeit goods and who refuse to deal in good faith with the judicial system. It authorizes the court to issue appropriate orders, including, when appropriate, temporary restraining orders (with or without notice to the defendant) and *ex parte* orders to seize counterfeit goods, spurious marks, the means of making spurious marks, articles bearing or intended to bear such marks, and business records documenting the manufacture, purchase, or sale of counterfeit goods or materials.

This subsection is primarily directed at situations in which a plaintiff can show that a party has counterfeit goods or other materials bearing spurious marks, and that if ordered by the court to retain the goods or materials, the party would be likely to defy the order by destroying, hiding, or transferring them. In addition, this subsection authorizes the issuance of a seizure order on an *ex parte* basis if the plaintiff can show that the defendant will otherwise act

[15]

to prevent the court from effectively exercising jurisdiction over him or her.

The Committee recognizes that *ex parte* seizure orders are an extraordinary remedy, which must be used sparingly and only as needed. The Committee does not intend that these orders be used against reputable businesses except under unusual circumstances    . such as when the applicant can make a particularized showing that the merchant would be likely to defy a court order to maintain the status quo. A reputable merchant would not be likely to defy a court order to retain goods or otherwise act to frustrate the court's jurisdiction, and the issuance of an *ex parte* seizure order against such a merchant would therefore be wholly inappropriate, in the absence of the unusual circumstances just mentioned. Rather, the Committee believes that *ex parte* seizure orders are an appropriate tool when dealing with defendants who are likely to attempt to defeat a court's efforts to exercise jurisdiction over them. The strongest evidence that a defendant would be likely to attempt to defeat a court's efforts to exercise jurisdiction over them. The strongest evidence that a defendant would be likely to do so would be evidence that he or she had acted in bad faith towards the judicial process in the past. A court may, however, consider any other evidence relevant to this determination.

To ensure that *ex parte* seizure orders are used only when necessary, and that they are not abused for anti--competitive purposes, the bill includes numerous procedural protections, which are discussed at greater length

below. In addition, the bill incorporates the Federal Rules of Civil Procedure by reference in paragraphs (3) and (6).

*Subsection 2320(f)(2).* The Committee recognizes that the seizure of business records poses particularly difficult questions. The seizure of such records can be vital to the victimized plaintiff, since if the defendant is permitted to destroy those records, the plaintiff may be at a complete loss in attempting to prove his or her damages. However, the Committee believes that courts must be sensitive to the concerns of defendants about the release of confidential business information, especially when that information might be used to enforce a scheme of resale price maintenance. To ensure that the procedures provided for in this bill cannot be used for such purposes, the bill provides that any records seized in a civil proceeding should be placed immediately into the custody of the court, and that they should be made available only under an appropriate protective order to protect any confidential business information that may be contained in the records, such as the names of sources of supply. The Committee intends the procedures described in subsection 2320(g) to be used in setting the terms of any such protective order. Courts should also take prcautions to ensure that representatives of the plaintiff not be permitted to examine documents containing confidential business information during the course of an *ex parte* seizure.

As with the *ex parte* seizure of any other materials, the Committee believes that courts should consider all less drastic alternatives before approving an order for an *ex parte* seizure of business records. Thus, the court should consider whether an order directing the defendant to maintain the records in their current condition would be adequate.

[16]

**Subsection 2320(f)(3).** This provision makes clear that a party seeking an *ex parte* seizure order must supply the court with affidavits clearly setting forth the reasons why this form of relief is appropriate. In particular, the applicant should explain why it would not be sufficient to issue a temporary restraining order directing the defendant to retain custody of the goods or materials in question, or to turn them over to the court. In addition, should the court find that issuance of an *ex parte* seizure order is appropriate, the court must then determine the amount of security that the applicant must provide to protect the defendant should the seizure prove to have been wrongful. The Committee believes that in

setting the amount of security, courts should err on the side of caution----that is, towards larger bonds----in light of the need to protect the unrepresented defendant, and to ensure that he or she will have an effective remedy if he or she is the victim of a wrongful seizure.

Should a party's goods be wrongfully seized under this bill, the victim of the wrongful seizure will be entitled to collect damages from the party that applied for the seizure, including damages for loss of good will, if any. The Committee is particularly concerned that the good will of the defendants not be unfairly injured before they have had their day in court. This subsection therefore provides that any *ex parte* seizure order shall be placed under seal until the defendants have been given an opportunity to contest the order. The seal order shall provide that the applicant may not needlessly publicize the issuance or carrying out of the seizure order until the defendant has been given an opportunity to contest it. In addition, if a seizure proves to have been wrongfully ordered, the applicant will be responsible for any loss of good will that the applicant has suffered. In assessing such damages, the court should take into account whether the defendant needlessly publicized the planned seizure prior to issuance of the seizure order, as well as whether the applicant complied with the seal placed on the order once issued.

The Committee believes that the definition of a "wrongful seizure" must be developed on a case--by--case basis, in light of existing precedents under *Rule 65 of the Federal Rules of Civil Procedure.* However, the mere fact that a few non--counterfeit items may have been seized does not make the seizure as a whole wrongful; otherwise, a counterfeiter could ensure that any seizure of counterfeit merchandise would be "wrongful" simply by mingling a few genuine items with his or her inventory of fakes.

*Subsection 2320(f)(4).* This subsection states the findings that a court must make in order to issue an *ex parte* seizure order. First the court must find that a temporary restraining order, with or without notice, would be inadequate to protect the applicant's interests. The court must also find a sufficient basis for concluding, based upon

sworn statements submitted by the applicant, that: (1) there are counterfeit goods or other listed materials at the place identified by the applicant, and
(2) the applicant will suffer immediate and irreparable harm if the goods or materials are not seized through an *ex parte* order.

The applicant may prove irreparable harm by making any appropriate showing that: (a) the person from whom the goods or materi

[17]

als are to be seized would not comply with a court order to retain the goods or materials and to make them available to the court, but would instead make the goods or materials inaccessible to the court by destroying, hiding, or transferring them, or (b) the person from whom the goods or materials are to be seized would otherwise act to frustrate the jurisdiction of the court. In determining whether to issue an *ex parte* seizure order, one relevant factor would be that the goods or services in question pose a serious threat to health and safety. If an applicant has made some showing that a defendant is likely to defy a court order to maintain the status quo, the addition of a serious health and safety concern might justify issuance of an *ex parte* seizure order.

The subsection specifically provides that if an applicant can make the showing required by paragraphs (4) (A) and (B), no additional showing about the defendant's state of mind is needed. For example, it would not be necessary to show that the defendant knows at the time the application is filed that the goods in question are counterfeit. Such a showing will often be impossible to make at an *ex parte* hearing, and is in any event unnecessary. For example, a defendant may routinely transfer to confederates any goods that are the subject of a court proceeding, even if the defendant is not certain that the goods are counterfeit. If an applicant can make a sufficient showing that the goods *are* counterfeit, and that the defendant is likely to destroy, conceal, or transfer them if notified, an *ex parte* seizure order should be available regardless of whether the defendant knows at that time that the goods are counterfeit. Such an order would fulfill the vital purpose of protecting the court's ability effectively to exercise jurisdiction over the case.

*Subsection 2320(f)(6).* The Committee believes that for the maintenance of public order, it is important that law enforcement officials, and not private citizens, enforce seizure orders. When possible, U.S. Marshals should carry out the orders. However, the Committee recognizes that, in many judicial districts, U.S. Marshals have so many responsibilities relating to criminal matters that they are unable to respond expeditiously to requests by private parties for aid in civil matters. The Committee therefore believes that it is appropriate, when the court so designates, for local law enforcement officials to carry out *ex parte* seizures when Federal marshals are not readily available.

Within 10 days after the seizure is performed, a hearing shall be held concerning the legality of the seizure and the need for injunctive relief, if any. The Committee intends for this hearing to be conducted in accordance with *Rule 65 of the Federal Rules of Civil Procedure.* As is customary in connection with this sort of hearing, if a party requests it, discovery must be expedited to ensure that each party is able adequately to prepare for the hearing.

Any materials or goods seized under this subsection shall be taken into the custody of the court. If, at the hearing held after the seizure, the plaintiff makes the required showing that the goods are counterfeit, the court may retain custody of the goods, even if the plaintiff fails to meet some other requirement for issuance of an injunction, such as failure to show that he or she would sustain an irreparable injury if the goods were released. However, if the

[18]

plaintiff fails to make the required showing that the goods are counterfeit, the court must return the goods to the defendant.

The Committee recognizes that under some circumstances, a privately obtained seizure order might interfere with an ongoing criminal investigation by the U.S. Attorney's Office. Subsection 2320(f)(6) therefore requires an applicant for an *ex parte* seizure order to give notice to the U.S. Attorney for the local judicial district at least 24 hours before the order becomes effective. However, if the court determines that notice would be impracticable----for example, if the defendant is on the verge of leaving the jurisdiction with a cargo of counterfeit goods----this notice may be waived.

*Subsection 2320(f)(7).* A party that has notified the trademark registrant in advance of its intention to use a

particular mark and that has labeled its goods appropriately, in accordance with subsection 2320(c), is not subject to an *ex parte* seizure under this subsection.

*Subsection 2320(g).* This subsection directs courts to employ appropriate procedures to ensure that confidential business information, such as the names of suppliers, is not improperly disclosed in discovery proceedings in civil cases under this bill. The Committee recognizes that the courts have developed a number of solutions to this problem, and believes that three procedural devices in particular are worthy of special consideration.

The first is the use of a third party, chosen by the court or by agreement of all parties concerned, who can examine business records and extract the needed information without revealing the names of suppliers or other sensitive information. This procedure, apparently first used by Judge Zavatt in *Triangle Manufacturing Co. v. Paramount Bag Manufacturing Co., 35 F.R. 540 (S.D.N.Y. 1964),* has since been used in numerous other cases, including *Battle Creek Equipment Co. v. Roberts Manufacturing Co., 90 F.R.D. 85 (W.D. Mich. 1981).* The second is *in camera* inspection of the sensitive documents. *See Altech Industries, Inc. v. Al Tech Specialty Steel Corp., 528 F. Supp. 521 (D. Del. 1981).* Should the court find that these procedures are inappropriate or not fully satisfactory, a protective order may issue that would limit disclosure of sensitive business information to outside counsel employed by the opposing party. *See Federal Open Market Committee v. Merrill, 443 U.S. 340, 362 n.24 (1979); Federal Trade Commission v. Exxon Corp., 636 F.2d 1336, 1349--51 (D.C. Cir. 1980); Chesa International, Ltd Fashion Associates, 425 F. Supp. 234* (S.D.N.Y.), *aff'd, 573 F.2d 128 (2d Cir. 1977).* In weighing whether and in what form disclosure of privileged business information should be permitted, the courts should, of course, balance the plaintiff's showing of need for the information against the defendant's claim of privilege.

A solution to the problem of protecting sensitive business information from improper disclosure will need to be tailored to the facts of each individual case. For example, although the disclosure of key information solely to a party's outside counsel will in many instances provide a satisfactory solution to the problem of confidentiality, this solution might not be appropriate if that counsel also represents the party in related litigation in which the information would not be discoverable. In general, however, the Committee believes that thoughtful use of procedural safeguards will help avoid

[19]

any possibility that parties might use suits under this bill to obtain and misuse confidential business information.

*Subsection 2320(h).* If a court finds goods to be counterfeit in either a criminal or a civil case, it may, after reasonable notice to the U.S. Attorney, order the goods and related materials to be destroyed, or order that any spurious marks be removed from the goods or materials and that the goods or materials be given to the United States or to an appropriate charity.

*Subsection 2320(i).* The Committee wishes to discourage frivolous of nuisance suits under the bill, and to help prevent an allegation of counterfeiting from becoming a "boiler plate" pleading in every trademark suit. Should a party bring a suit in bad faith under this bill----for example, as part of an effort to control the resale prices of authentic trademarked goods----this subsection provides that the victimized defendant will be entitled to an award of damages, including punitive damages when appropriate, and the costs of defending the action, including reasonable attorney's and investigator' fees. The Committee believes that if a defendant can show that the plaintiff pleaded or pursued a suit against him or her in bad faith, an award of substanital punitive damages will usually be appropriate. Of course, this provision does not exclude any remedies that a victimized defendant may have under the antitrust laws or other laws.

The Committee wishes to emphasize, however, that this provision is not intended to reverse the usual principles of the Federal Rules of Civil Procedure with respect to "notice pleading." Thus, a plaintiff need not have conclusive proof that the defendant has intentionally trafficked in known counterfeits in order to file a suit under this bill. Should a plaintiff plead or pursue a suit when it is clear that the suit is baseless, however, this provision would make the plaintiff liable in damages to the victimized defendant. For example, should the plaintiff learn as a result of discovery that any claim of counterfeiting is meritless, continued pursuit of such a claim would be in bad faith.

*Subsection 2320(j).* This subsection is intended to clarify that this bill does not in any way alter, supersede, or change the enforceability of the remedies that now exist under the Lanham Act and other pertinent civil and criminal statutes. That is, the remedies provided by this bill are intended to be in addition to, and not in substitution for, the

remedies provided by other Federal, State, or other laws. Of course, when a civil claimant recovers treble damages or profits under proposed section 2320, he or she would not be entitled to corresponding recovery under any other Federal, State, or other law in connection with the same underlying transactions or occurrences.

This subsection also ensures that provisional and equitable remedies that are available under the Lanham Act will be available under this bill as well. For a description of some existing remedies under the Lanham Act, *see* Bainton, *supra*, 73 Trademark Rep. 459.

*Subsection (k).* Section 32 of the Lanham Act, codified at *15 U.S.C. 1114*(2), contains important protections for innocent printers and publishers in trademark cases. The Committee intends to incorporate those protections in full into the present bill.

[20]

*Section 3.* This section amends the table of sections at the beginning of chapter 113 of the United States Code to add a new item relating to section 2320.

*Section 4.* The Lanham Act currently uses the term "counterfeit" in several of its sections. To avoid confusion with the use of that term in the present bill, this section deletes uses of the term "counterfeit" in the Lanham Act, and makes appropriate changes to another statute, *19 U.S.C. 1526*(e), that refers to the definition of that term in the Lanham Act.

*Section 5.* This bill takes effect upon enactment.

## VI. REGULATORY IMPACT STATEMENT

Pursuant to paragraph 11(b), Rule XXVI of the Standing Rules of the Senate, the Committee has concluded that the Act will have no direct regulatory impact.

## VII. COST OF LEGISLATION

In accordance with paragraph 11(a) of Rule XXVI of the Standing Rules of the Senate and section 403 of the Congressional Budget Act of 1974, the Committee provides the following cost estimate, prepared by the Congressional Budget Office:

U.S. Congress,

Congressional Budget Office,

*Washington, DC, June 4, 1984.*

Hon. STROM THURMOND,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed S. 8 the Trademark Counterfeiting Act of 1984, as ordered reported by the Senate Committee on the Judiciary, May 10, 1984. We estimate that no significant costs to federal, state, or local governments will result from the enactment of this bill.

S. 875 provides criminal penalties and increased civil penalties for persons who intentionally and knowingly traffic in counterfeit goods or services. The bill applies to all goods and services with identifying marks that are registered with the U.S. Patent and Trademark Office and to any unauthorized use of Olympic symbols. Convicted individuals will face up to five years in prison and up to $250,000 in fines. Convicted corporations or other legal entities may be fined up to $1 million. Claimants in civil actions may recover the greater of triple the claimant's damages or triple the defendant's profits, plus the cost of investigating and prosecuting the action. A defendant may be awarded damages if he is found innocent.

Based on information provided by the Department of Justice and the Patent and Trademark Office, we expect that enactment of the bill will not result in any signficant increase in agency workloads or costs. Most of the cases

would be subject to civil adjudication, where the costs would be absorbed by one of the parties. The collection of fines may result in some additional receipts to the federal government, although there is no reliable basis for estimating these amounts.

[21]

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

RUDY G. PENNER.

VIII. CHANGES IN EXISTING LAW In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by
S. 875 are as follows: Existing law proposed to be omitted is enclosed in black brackets, new material is printed in italic, existing law in which no change is proposed is shown in roman.

**UNITED STATES CODE**

*****

**TITLE 15—COMMERCE AND TRADE**

*****

**CHAPTER 22.—TRADE–MARKS**

*****

**Subchapter III.—General Provisions**

*****

Sec.1114. Remedies; infringement; innocent infringement by printers and publishers.

*****

1118. Same; destruction of infringing articles.

*****

1127. Construction and definition; intent of chapter. *****

**§ 1114. Remedies; infringement; innocent infringement by printers and publishers**

*****

(a) use in commerce any reproduction, [counterfeit,] copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, [counterfeit,] copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale,

[22]

distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.*****

### § 1118. Destruction of infringing articles

In any action arising under this chapter, in which a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established, the court may order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of the defendant, bearing the registered mark or any reproduction, [counterfeit,] copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same, shall be delivered up and destroyed.

*****

### § 1127. Construction and definitions; intent of chapter

*****[A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from a registered mark.]*****

### TITLE 18—CRIMES AND CRIMINAL PROCEDURE
*****

### CHAPTER 113—STOLEN PROPERTY

Sec.

2319. Criminal infringement of a copyright.

2320. Trafficking in counterfeit goods or

services. *****

### § 2320. Trafficking in counterfeit goods or services

*(a)* Whoever intentionally traffics or attempts to traffic in goods or services knowing such goods or services to be counterfeit shall, if such offender is an individual, be fined not more than $250,000 or imprisoned for not more than five years, or both, or if such offender is a corporation, partnership, association, or other legal entity, be fined not more than $1,000,000.

*(b)* As used in this section
*(1)* "counterfeit goods or services" means
*(A)* goods or services
*(i)* on or in connection with which a spurious mark, which is identical to or substantially indistinguishable from a genuine mark, is used or intended to be used; and

[23]

*(ii)* for which the genuine mark is registered on the principal register in the United States Patent and Trademark Office and is in use; or
*(B)* goods or services on or in connection with which a designation that is identical to or substantially indistinguishable from a designation that is specifically protected by section 110 of the Amateur Sports Act of 1978 (36 U.S.C. 380) is used or intended to be used in a manner prohibited by such Act, without the consent of the United States Olympic Committee; and
*(2)* "traffic" means to
*(A)* transfer, assign, or dispose of, to another, for value;
*(B)* offer to so transfer, assign, or dispose of;

*(C) receive, possess, transport, or exercise control of, with intent to so transfer, assign, or dispose of; or*
*(D) assist or conspire with another in doing anything prohibited by subparagraphs (A) through (C); and*
*(3) "spurious mark" means a mark that is not genuine or authentic.*

*(c)(1) A defendant who traffics in goods or services that are alleged to be counterfeit shall not be subject to the criminal penalties or civil remedies of this section if the defendant establishes by a preponderance of the evidence that adequate labeling was provided on the goods or services and that adequate notice was provided to the registrant of the genuine mark.*

*(2)(A) A labeling shall be deemed adequate if, in each place where the alledgedly spurious mark is used, the labeling clearly and conspicuously identifies the manufacturer of the goods or provider of the services, and disclaims any license from or affiliation with the owner of the genuine mark.*

*(B) Notice to the registrant of the genuine mark shall be deemed adequate if it was in writing and*
*(i) was actually served upon the registrant of the mark at at least thirty days before the defendant trafficked in goods or services using the allegedly spurious mark,*

*(ii) stated the defendant's full name and business addresses,*

*(iii) identified in detail the proposed mark and the goods or services for which the defendant planned to use the mark, and*

*(iv) stated the date upon which the defendant intended to begin trafficking in goods or services using the mark.*

*The notice shall be deemed inadequate if the trafficking began before the date specified in the notice.*

*(3) Adequate notice and labeling under this subsection shall not be an affirmative defense for a defendant who traffics in counterfeit goods or services while the defendant is subject to a court order restraining or enjoining such trafficking.*
*(4) A party's compliance with the notice and labeling provisions of this subsection shall not be dispositive of that party's liability under any other provision of law, including any Federal, State, or other law.*

*(d)(1) An action seeking civil remedies for a violation of subsection (a) of this section may be brought, without regard to the amount in controversy, in any district court of the United States in the district*

[24]

in which the violation occurred or in which the defendant resides, is found, has an agent, or transacts business. Such an action may be brought by either a registrant of a mark registered on the principal register in the United States Patent and Trademark Office whose business of property is or may be injured by reason of a violation of this section involving the mark of the registrant, or by the United States Olympic Committee. Upon establishing such a violation by a preponderance of the evidence, such civil claimant shall recover--

*(A) the greater of treble claimant's damages or treble defendant's profits,*
*(B) the claimant's costs of the action, and*
*(C) the claimant's costs of investigating the violation and prosecuting the suit, including reasonable investigator's and attorney's fees.*
*(2) The court, on a motion promptly made, may in its discretion award prejudgment interest on the monetary recovery*

*In assessing defendant's profits, the claimant shall be required to prove defendant's sales only. The defendant must prove all elements of cost or deduction claimed therefrom.*

(2) The court, on a motion promptly made, may in its discretion award prejudgment interest on the monetary recovery awarded under this subsection and subsection (f)(3) and (i) of this section, at an annual interest rate established under section 6621 of the Internal Revenue Code of 1954, commencing on the date of the service of the civil claimant's pleadings setting forth the claim for monetary recovery and ending on the date such judgment is awarded, or for such shorter time as the court deems appropriate

*(3) A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this section shall estop the defendant from denying the essential allegations of the criminal offense in any civil proceeding brought by any civil claimant under this section.*

*(e) All defense available in an action brought under the Act of July 5.1946, commonly known as the Trademark Act of 1946 (60 Stat. 427; 15 U.S.C. 1051 et seq.) shall be available, if relevant, in any criminal or civil action brought under this section.*

*(f)(1) In any civil proceeding brought pursuant to this section the district courts of the United States shall have jurisdiction to prevent and restrain trafficking in counterfeit goods or services by issuing appropriate orders, including, in appropriate circumstances, temporary restraining orders on notice to the defendant, ex parte temporary restraining orders, and ex parte orders for the seizure of counterfeit goods and the following materials:*

*(A) spurious marks;*
*(B) the means of making such spurious marks;*
*(C) articles in the defendant's possession bearing such spurious marks, or on or in connection with which such spurious marks are intended to be used; and*
*(D) business records documenting the manufacture, purchase, or sale of counterfeit goods or of the materials listed in subparagraphs (A) through (C) of this paragraph.*

*(2) Any business records seized through an ex parte seizure order in a civil proceeding under this section shall be taken into the custody of the court. The applicant or its representatives shall not be permitted to see any such records during the course of the seizure or thereafter, except under an appropriate protective order, issued on*

[25]
notice to the person from whom the records were seized, with respect to confidential business information.
*(3) Ex parte seizure orders under this section shall be subject to the Federal Rules of Civil Procedure. No such order shall be issued unless the applicant*
*(A) provides an affidavit clearly setting forth specific facts in support of the need for the seizure order, and*
*(B) provides security in an amount the court deems adequate to compensate any person for damages such person may suffer as a result of a wrongful seizure or wrongful attempted seizure of such person's property under this subsection.*

*Such damages shall include, but not be limited to, lost profits, the cost of materials, and loss of good will. In any case in which it is shown that the applicant caused the seizure without adequate evidence that the goods or materials were counterfeit, damages shall include reasonable attorney's fees. The court shall place under seal any order for an ex parte seizure under this section until the defendant has been given an opportunity to contest such order.*

*(4) No order for an ex parte seizure under this subsection shall be issued unless the court finds that a temporary restraining order on notice to the defendant, or an ex parte temporary restraining order, would be inadequate to protect the applicant's interest. In particular, no court shall issue any order for an ex parte seizure under this subsection unless it clearly appears from specific facts offered under oath or affirmation that*

*(A) counterfeit goods or the materials described in paragraph (1) are located at the place identified in the affidavit, and*
*(B) the applicant will suffer immediate and irreparable injury, loss, or damage if the goods or materials are not seized through execution of an ex parte order, in that*
*(i) the person from whom the goods or materials are to be seized would not comply with an order to retain the goods or materials and to make them available to the court, but would instead make the goods*

*or materials inaccessible by destroying, hiding, or transferring them; or*

*(ii) the person from whom the goods or materials are to be seized will otherwise act to frustrate the jurisidction of the court in a proceeding under this section.*

*If the applicant can make this showing, the applicant need not make any further showing about the defendant's state of mind in order to obtain an ex parte seizure order.*

*(5) Any order for a seizure under this subsection shall particularly describe the goods or materials to be seized, the place from which they are to be seized, and the amount of security provided by the applicant.*

*(6) Any seizure ordered under this subsection shall specify that such order is to be carried out by a United States Marshal or other law enforcement officer or agency designated by the court. Any matter seized shall be taken into the custody of the court, pending a hearing to be conducted within ten days after the seizure concerning the legality of the seizure and the need for injunctive relief, if any. Such hearing shall be conducted pursuant to rule 65 of the Federal Rules of Civil Procedure. All parties shall be granted, upon request, expedited discovery in connection with such hearing. Should the*

[26]

*Plaintiff fail to make the showing required by rule 65, the goods or materials seized shall be returned to the defendant, unless the court specifically finds that the goods or materials are counterfeit, in which case the court may retain them for evidentiary purposes. Such seizure shall be made only after the order has been served upon the defendant, his agent, accomplice, or designee. The applicant shall give notice of an application for an order under this section to the United States Attorney for the district in which the issuing court sits. Such notice shall be given at least twenty-four hours before the order becomes effective, unless the court determines that such notice would be impracticable.*

*(7) No order for a seizure shall be issued under this subsection if the defendant has complied with the notice and labeling provisions of subsection (c) of this section.*

*(g) The court shall employ appropriate procedures to ensure that confidential business information is not improperly disclosed in discovery proceedings in civil cases under this section.*

*(h) If, in any civil or criminal action brought under this section, the court determines that the goods or services at issue are counterfeit, the court may, after reasonable notice to the United States Attorney for the district in which the issuing court sits, order the destruction of all counterfeit goods, spurious marks, means of making such spurious marks, and materials bearing such spurious marks, which are in the possession or control of the court or any party to the action; or, after obliteration of any spurious mark, the court may order the disposal of such goods, marks, means, or materials to the United States or an eleemosynary institution.*

*(i) When a civil claimant in bad faith pleads or pursues a cause of action under subsection (d) of this section, the court shall award damages to the defendant, including punitive damages when appropriate, and the costs of defending the cause of action, including reasonable investigator's and attorney's fees incurred by the defendant.*

*(j) Nothing in this section shall supersede or change any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section, except that no civil claimant who recovers treble damages or treble profits pursuant to this section shall also be entitled to corresponding recovery under any other Federal, State, or other law in connection with the same underlying occurrences or transactions. Any provisional or equitable remedy that would be available in a comparable civil action under the Trademark Act of 1946 shall, to the same extent and upon a comparable showing, be available under this section.*

*(k) The remedies available in any civil action under this section shall be subject to the limitations specified in section 32 of the Trademark Act of 1946 (15 U.S.C. 1114(2)).*

\*\*\*\*\*

### TITLE 19—CUSTOMS DUTIES

\*\*\*\*\*

[27]

# CHAPTER 4----TARIFF ACT OF 1930

* * * * *

**Subtitle II——Special Provisions**
* * * * *

Sec. 1526. Merchandise bearing American trademark.
* * * * *

(e) Merchandise bearing counterfeit mark; seizure and forfeiture, disposition of seized goods.
* * * * *

## MERCHANDISE BEARING COUNTERFEIT MARK; SEIZURE AND FORFEITURE; DISPOSITION OF SEIZED GOODS

(e) Any such merchandise bearing [a counterfeit mark (within the meaning of section 1127 of Title 15)] *a spurious mark that is identical to, or substantially indistinguishable from, a mark registered in the United States Patent and Trademark Office,* imported into the United States in violation of the provisions of section 1124 of Title 15, shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws. Upon seizure of such merchandise, the Secretary shall notify the owner of the trademark, and shall, after forfeiture, obliterate the trademark where feasible and dispose of the goods seized--

*****

98th Congress, 1st Session

To amend title 18 of the United States code to strengthen the laws against the counterfeiting of trademarks, and for other purposes.

IN THE HOUSE OF REPRESENTATIVES

APRIL 7, 1983

**Mr. RODINO (for himself, Mr. EDWARDS of California, and Mr. FRANK) introduced the following bill; which was referred to the Committee on the Judiciary**

**REPORT**

together with ADDITIONAL VIEWS [To accompany H.R. 6071] [Including cost estimate of the

Congressional Budget Office] The Committee on the Judiciary, to whom was referred the bill (H.R.

6071) to amend title 18 of the United States

Code to strengthen the laws against counterfeiting trademarks,
and for other purposes, having considered the same, report
favorably thereon with an amendment and recommend that the
bill as amended do pass. The amendment is as follows: Strike out
all after the enacting clause and insert in lieu thereof the
following:

That this Act may be cited as the "Trademark Counterfeiting Act of 1984".TITLE 18 AMENDMENT

SEC. 2. (a) Chapter 113 of title 18 of the United States Code is ameby adding at the end the

following:

### "§ 2320. Use of counterfeit marks

"(a) Whoever engages or attempts to engage in conduct for which section 32(1)(a) of the
Lanham Act *(15 U.S.C. 1114*(1)(a)) or Section 110 of the Olympic Charter Act *(36 U.S.C.
380)* provides a civil remedy, by intentionally using a mark or designation, knowing such mark
or designation is a counterfeit mark, in connection with the sale, offering for sale, or
distribution of goods or services shall, if an individual, be fined not more than $250,000 or
imprisoned not more than five years, or both, and, if a person other than an individual, befined
not more than an individual, be fined not more than $1,000,000. In the case of an offense by a
person under this section which occurs after that person is convicted of another offense under
this section, the person convicted, if an individual, shall be fined not more than $1,000,000 or
imprisoned not more than fifteen

[2]

years, or both, and if other than an individual, shall be finded not more than $5,000,000.

"(b) Any documents seized and held by an agency or other entity of the Federal
Government in connection with a prosecution under this section are exempt from disclosure
under section 552 of title 5 of the United States Code (commonly referred to as the 'Freedom
of Information Act').

"(c) Upon a showing that any articles in the possession of a defendant in a prosecution
under this section bear counterfeit marks or designations, the United States may obtain an
order for the destruction of such articles.

"(d) For the purpose of this section--

"(1) the term 'counterfeit mark' means--   "(A) a spurious mark which is used in connection
with the sale, offering for sale, or distribution of goods or services and which is identical with,
or substantially indistinguishable from, a mark registered for those goods or services on the
principal register in the United States Patent and Trademark Office; or

"(B) a spurious designation which is identical with, or substantially
indistinguishable from, a designation as to which the remedies of the Lanham Act are
made available by reason of section 110 of the Olympic Charter Act;

but such term does not include any mark or designation used in connection with goods or services of

whichthe manufacturer or producer was, at the time of the manufacture or production in question or a reasonabletime before such manufacture or production, in a contractual or other relationship, permitting the use of themark or designation for the type of goods or services so manufactured or produced, with the holder of theright to use such mark or designation, unless the user has knowledge of the termination of the relationship;and

"(2) the term 'Lanham Act' means the Act entitled 'An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes', approved July 5, 1946 *(15 U.S.C. 1051* et seq.); and

"(3) the term 'Olympic Charter Act' means the Act entitled 'An Act to incorporate the United States Olympic Association', approved September 21, 1950 *(36 U.S.C. 371* et seq.).".

(b) The table of sections at the beginning of chapter 113 of title 18 of the United States Code is amended byadding at the end the following new item:

"2320. Use of

counterfeit marks.". LANHAM

ACT AMENDMENT

SEC. 3. The Act entitled "An Act to provide for the registration an protection of trademarks used in commerce,to carry out the provisions of certain international conventions, and for other purposes", approved July 5,1946 *(15 U.S.C. 1051* et seq.) is amended--

(1) in section 34 *(15 U.S.C. 1116)*
(A) by designating the first paragraph as subsection (a);
(B) by designating the second paragraph as subsection (b);
(C) by designating the third paragraph as subsection (c); and
(D) by adding at the end the following:

"(d)(1)(A) In the case of a civil action arising under section 32(1)(a) of this Act *(15 U.S.C. 1114)* or section110 of the Act entitled 'An Act to incorporate the United States Olympic Association', approved September21, 1950 *(36 U.S.C. 380)* with respect to a violation which consists of using a mark or designation inconnection with the sale, offering for sale, or distribution of goods or services, if the user knew or shouldhave known that such mark or designation is a counterfeit mark the court may, upon ex parte application,grant an order under subsection (a) of this section pursuant to this subsection.

"(B) Such order may provide for the seizure of goods and marks and designations involved in suchviolation and the means of making such marks and designations, and documents relating to the manufacture,sale, or receipt of things involved in such violation.

"(C) As used in this subsection the term 'counterfeit mark' means--

"(i) a counterfeit of a mark registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed; or

"(ii) a spurious designation which is identical with, or substantially indistinguishable from,a designation as to which the remedies of this Act are made

[3]

available by reason of section110 of the Act entitled 'An Act to incorporate the United States Olympic Association', approvedSeptember 21, 1950 *(36 U.S.C. 380);*
but such term does not include any mark or designation used in connection with goods or services of

which the manufacturer or producer was, at the time of the manufacturer or production in question or a reasonable time before such manufacturer or production, in a contractual or other relationship, permitting the use of the mark or designation for the type of goods or services so manufactured or produced, with the holder of the right to use such mark or designation, unless the user has knowledge of the termination of the relationship.

"(2) The court shall not receive an application under this subsection unless the applicant has given timely notice of the application to the United States attorney for the judicial district in which such order is sought. Such attorney may participate in the proceedings arising under such application if such proceedings may affect evidence of an offense against the United States.

"(3) The application for an order under this subsection shall

"(A) be based on affidavit or the verified complaint establishing facts sufficient to support the findings of fact and conclusions of law required for such order; and

"(B) contain the additional information required by paragraph (5) of this subsection to be setforth in such order.

"(4) The court shall not grant such an application unless the court finds that it clearly appears from specific facts that--

"(A) an order other than an order issued under this subsection is not adequate to achieve thepurposes of section 32 of this Act *(15 U.S.C. 1114);*"(B) the applicant has not publicized the requested seizure;"(C) success on the merits by the applicant is likely;"(D) an immediate and irreparable injury will occur if such seizure is not ordered;"(E) the matter to be seized will be located at the place identified in the application;"(F) the harm to the applicant of denying the application outweighs the harm to the personagainst whom seizure would be ordered of granting the application;"(G) the public interest would not be seriously adversely affected by granting the application;and"(H) the matter subject to such an order will be destroyed, moved, hidden, or otherwise madeinaccessible.

"(5) An order under this subsection shall set forth--

"(A) the findings of fact and conclusions of law required for the order;"(B) a particular description of the matter to be seized, and a description of each place atwhich such matter is to be seized;"(C) the time period, which shall end not later than seven days after the date on which suchorder is issued, during which the seizure is to be made;"(D) the amount of security required to be provided under this subsection; and
"(E) a date for the hearing required under paragraph (11) of this subsection.

"(6) The court shall take appropriate action to protect the person against whom an order under this

subsection is directed from publicity, by or at the behest of the plaintiff, about such order and any seizure under such order until the end of the hearing required under paragraph (11) of this subsection and may continue such action in the court's discretion after such hearing.

"(7) Documents may be seized under this subsection only if the court enters a protective order forbidding the disclosure of any such documents, or the contents thereof, to any third party and requiring that the documents so seized be treated as confidential and not made available to the parties except under paragraph
(12) of this subsection. The protective order shall also provide that all documents so seized, other than any matter disposed of under section 36 of this Act *(15 U.S.C. 1118)*, shall be returned to the person from whose custody such documents were seized and no information contained in such documents shall be retained after the order has lapsed or such litigation is concluded. The court may, for good cause shown, provide greater protection for the person from whom such documents were seized.

"(8) A person obtaining an order under this subsection shall provide the security determined adequate by the court for the payment of such damages as any person may recover as a result of a wrongful seizure under this subsection.

"(9) An order under this subsection, together with the supporting documents, shall be sealed until the party in possession of the matter seized has an opportunity to contest such order, except that any person against whom such order is issued

[4]
shall have access to such order and supporting documents after the seizure has been carried out.

"(10) The court shall designate a United States marshal or other law enforcement officer to serve a copy of the order under this subsection and then to carry out the seizure under such order. The court shall issue orders when appropriate to protect the defendant from undue damage from the disclosure of trade secrets or other confidential information kept in the course of business, including an order restricting the access of the applicant (or any agent or employee of the applicant) to such secrets or information. The person carrying out the seizure shall in doing so follow, insofar as practicable, the requirements the Federal Rules of Criminal Procedure impose for the execution and return with inventory of a warrant for search and seizure, as though the seizure ordered under this subsection were pursuant to such a warrant.

"(11)(A) The court shall hold a hearing, unless waived by all the parties, on the date set by the court in the order of seizure. That date shall be not sooner than ten days after the order is issued and not later than fifteen days after the order is issued, unless the applicant for the order shows good cause for another date or unless the party against whom such order is directed consents to another date for such hearing. At such hearing the party obtaining the order shall have the burden to prove that the facts supporting findings of fact and conclusions of law necessary to support such order are still in effect. If that party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

"(B) In connection with a hearing under this paragraph, the court may make such orders modifying the time limits for discovery under the Rules of Civil Procedure as may be necessary to prevent the frustration of the purposes of such hearing.

"(12) Documents seized under this subsection shall be placed in the custody of the court. The court may make such documents available to the attorneys of record for all parties in the civil action, giving due consideration to the need to protect confidential information, except that the court shall not disclose to such attorneys any such document not determined relevant and material to such civil action unless the court finds that the participation of such attorneys is necessary to make such determination. Insofar as practicable documents to be made available under this paragraph shall be made available early enough to permit the parties to prepare for the hearing required under paragraph (11) of this subsection.

"(13) A person who suffers damage by reason of a wrongful seizure under this subsection may

commence a civil action against the applicant for the order under which such seizure was made, and in such civil action shall recover such relief as may be appropriate, including damages for lost profits, cost of materials, unjust enrichment, and loss of good will, and a reaonsable attorney's fee.";

> (2) in section 35 *(15 U.S.C. 1117),* by inserting before the period at the end of the sentence which begins "In assessing damages" the following:

", and shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 32(1)(a) of this Act *(15 U.S.C. 1114*(1)(a)) or section 110 of the Act entitled 'An Act to incorporate the United States Olympic Association', approved September 21, 1950 *(36 U.S.C. 380)* which consists of

> intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined

> in section 34(d) of this Act *(15 U.S.C. 1116*(d)), in connection with the sale, offering for sale, or distribution

> of goods or services"; and

> (3) in section 36 *(15 U.S.C. 1118),* by adding at the end of such section "The party seeking an order under this section give timely notice to the United States attorney for the judicial district in which such order is sought, and such United States attorney may, if such destruction may affect evidence of an offense against the United States, seek a hearing on such destruction or participate in any hearing otherwise to be held with respect to such destruction."

H.R. 6071, as reported by the Committee, would amend titles 15 and 18 of the United States Code. The primary purpose of the bill is to provide increased sanctions for the counterfeiting of certain registered trademarks. There are at present no Federal criminal laws that proscribe such conduct. The Trademark Act of 1946, *15 U.S.C. § 1051* et seq. (commonly known, and hereinafter referred to,

[5]

as the Lanham Act), creates a civil cause of action for the counterfeiting of trademarks. *15 U.S.C. § 1114.*

This legislation provides the same sanctions for the counterfeiting of Olympic designations, now protected under the Olympic Charter Act, *36 U.S.C. § 371* et seq. The discussion of trademark counterfeiting in this report subsumes Olympic designations.

In the opinion of the Committee, the current law civil remedies are inadequate to address this serious and growing problem. While perhaps the most widely known instance of trademark counterfeiting relates to designer clothing, such conduct now extends to a variety of other articles, including cosmetics, pharmaceuticals, heart pacemakers, and aircraft parts. See, e.g., Testimony and Statement of James L. Bikoff, President, International Anticounterfeiting Coalition, Hearings on H.R. 2447, the Trademark Counterfeiting Act of 1983 Before the Subcommittee on Crime of the House Committee on the Judiciary, 98th Cong., 2d sess. (1983--84) (hereinafter cited as Trademark Counterfeiting Act Hearings).

The extent of trademark counterfeiting in all contexts is increasing. The International Trade Commission has found, for instance, that sales lost to foreign product counterfeiting increased from $37.5 million to $49.2 million from 1980 to 1982. United States International Trade Commission, USITC Publication 1479. The Effects of Foreign Product Counterfeiting on U.S. Industry (January 1984).

Trademarks play an important role in our society, by enabling businesses to identify themselves to their customers and to link that identity to their reputations for quality goods and service. In turn, trademarks permit consumers to readily identify certain products and services and to patronize those businesses with an expectation of quality.

Trademark counterfeiting has a detrimental effect on these legitimate expectations. When articles bearing trademarks are copied exactly, or substantially so, buyers of those goods are deluded into believing that they have purchased the genuine article. Often, the copies fail to meet the quality control standards imposed by the trademark owner. In fact, the counterfeit articles may present grave risks to the health and safety of consumers of those articles. For example, the use of fake, and often substandard, parts in an aircraft endangers passengers, crew, and those on the ground as well. This was precisely the case described

in *Textron, Inc. v. Aviation Sales, Inc.,* No. CV--77--1317, at 5 (C.D.Cal., Sept. 30, 1980) where the court found that the defendants' copies of plaintiff's helicopter parts "were critical or primary helicopter parts whose failure would result in the inflight loss of control of the helicopter [,...whose parts] lacked any quality control procedure or inspections to determine their airworthiness [, and whose parts] were defective, not airworthy, and created a grave risk to human life and safety."

In fact, the court found that "several helicopters have crashed resulting in injuries and death as the result of the failure of these parts manufactured and sold by the defendants." Id.

While not all cases of trademark counterfeiting have such serious consequences for human safety, such conduct can have a dire effect on the economy. Businesses are unjustly criticized for having

[6]

sold substandard products, when in fact the products are fake. Consumers buy products that fall apart after minimal use. Trademark owners lose sales to counterfeiters, when consumers seeking the genuine article mistakenly buy the counterfeit. As businesses suffer economically, workers suffer a corresponding loss of jobs. Statement of Gerald B. Mossinhoff, Assistant Secretary and Commissioner of Patents and Trademarks, Trademark Counterfeiting Act Hearings supra.

The purpose of this legislation, therefore, is to strengthen existing laws on trademark counterfeiting. As stated above, no Federal criminal laws specifically punish such conduct. Certain Federal statutes, such as sections 1341 and 1343 of title 18 (relating to mail and wire fraud), may cover some instances of trademark counterfeiting, but those statutes are not specifically directed at such conduct and do not always adequately address it. Statement of Timothy J. Finn, Associate Deputy Attorney General, Trademark Counterfeiting Act Hearings supra.

Customs laws and regulations provide limited sanctions for the attempted importation of goods bearing infringing and counterfeit trademarks. *19 U.S.C. § 1526, 19 C.F.R. §§ 133.21* and *133.23a.* Goods bearing infringing trademarks may be imported if the offending mark can be obliterated or destroyed. Goods bearing counterfeit marks, however, must be forfeited to the Government.

The statement of the Commissioner of Customs, William C. von Raab, noted that the Customs Service supports efforts to strengthen the laws against trademark counterfeiting. Trademark Counterfeiting Act Hearings supra. The Customs laws, like the Federal criminal laws, do not adequately address the trademark counterfeiting problem. Statement of Timothy J. Finn, Associate Deputy Attorney General, Trademark Counterfeiting Act Hearings, supra.

In addition, the hearings on H.R. 2447 adduced substantial testimony that the provisions of the Lanham Act are also inadequate to address the trademark counterfeiting problem. For example, *15 U.S.C. § 1117* authorizes a court to award treble damages to a plaintiff whose trademark has been counterfeited; however, in appropriate instances, some courts apparently have not exercized this discretion. Testimony of Jed Rakoff, Esq., Counsel to International Anticounterfeiting Coalition, Trademark Counterfeiting Act Hearings supra. In addition, plaintiffs have not uniformly been able to obtain seizures, on an ex parte basis, of counterfeit articles. Such seizures are essential in instances where the alleged infringer, if notified or pending legal action, is likely to thwart the court's exercise of jurisdiction by hiding the offending goods or by destroying them. Statement of Richard A. Wallen, Esq., Trademark Counterfeiting Act Hearings supra. This legislation will permit plaintiffs everywhere to obtain such seizures in trademark counterfeiting cases, and sets forth uniform procedures for doing so. Plaintiffs and defendants alike will no longer be forced to rely on the vagaries of common law.

While the Committee recognizes the seriousness of the trademark counterfeiting problem, and the necessity of enacting a Federal law to deter and punish such conduct, it believes that any such law must be limited to only the most egregious conduct. Otherwise, current civil provisions of the Federal law are adequate to

deal with such conduct. Statement of the section of Patent, Trademark and Copyright Law of the American Bar Association, Trademark Counterfeiting Act Hearings supra.

In this regard, the Committee takes no position on whether certain activities are violations of current civil law, but excludes such activities from the scope of this legislation. Excluded, for example, are practices involving so--called "overruns" and "parallel imports" or "grey market" goods. The term "overruns" in general refers to goods made by a trademark owner's designated manufacturer, but not permitted by, or violative of, the agreement between the owner and the manufacturer. For example, a manufacturer who has a contract with a trademark owner to make 500,000 pair of jeans, but during the night shift makes an extra 500,000 without the trademark owner's knowledge, may be liable to the trademark owner under the contract or under the provisions of civil law, but would not be subject to the criminal sanctions or increased civil remedies set forth in this bill. In another instance, the manufacturer may deliver the goods too late to meet the trademark owner's contractually mandated deadline. In such a case, the trademark owner would have the right to reject the goods. If the manufacturer then sells the rejected goods, those goods would not be considered counterfeit under this legislation. In fact, one court has held that such conduct is not even trademark infringement under the Lanham Act. *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corporation,* Nos. 81--5908 and 81--5972 (9th Cir., June 8, 1983).

The terms "parallel imports" and "grey market" goods generally refer to trademarked articles legitimately made overseas and then distributed outside the trademark owner's desired distribution channels. For a description of this kind of activity, *see Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,* No. 82--7867 (2nd Cir., Oct. 4, 1982).

Both of these kinds of activities are specifically excluded under the criminal and civil sections of this legislation. The Committee intends the exclusion to cover all situations involving "overruns" and "parallel imports" or "grey market" goods, and recognizes that, in an everchanging economic climate, the specific exclusion may not meet every possible instance of conduct it is not intended to cover. In such cases, the Committee relies on the elements of the offenses and the definition of "counterfeit mark" to ensure that the bill is interpreted in an appropriately narrow manner.

There is a third kind of activity that is excluded from this legislation's scope, and that relates to generic drugs. The Committee leaves it to the courts to determine when pharmaceuticals that are similar in appearance and are functionally equivalent to other, trademarked drugs, constitute trademark infringements. See, e.g., *Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844 (1982).* It does not intend that generic drugs be considered counterfeit for purposes of this legislation.

Closely related to the generic drug issue is that of "trade dress," or the recognizable design of a product or its package. While in certain circumstances, the trade dress may be registered as a trademark, it commonly is not. It is protected by this legislation only to the extent that it has been registered as a trademark and meets the other standards of this bill.

The Committee emphasizes that this legislation relates only to counterfeiting of registered trademarks, and that no conduct that is not already proscribed by current law is covered by this bill. In fact, the scope of this bill is narrower than current law, in that it creates enhanced penalties for only the most egregious conduct covered by current law.

The bill does not affect current statutory or common law governing other conduct proscribed by the Lanham Act, or other Federal, State, or local laws relating to trademarks. The same reservation applies to conduct covered by section 110 of the Olympic Charter Act.

Finally, this legislation relies in a number of instances on concepts and definitions of the Lanham Act. Unless it does so explicitly, however, the Committee does not intend in any way to modify the Lanham Act or judicial interpretations of it.

The Committee is aware of substantial concern that the provisions of this legislation will be used, or abused, to attempt to create a system of retail price maintenance. Statement of Joseph W. Rares, President, American Free Trade Association, Trademark Counterfeiting Act Hearings supra; Statement of Edward T. Borda, President, American General Merchandise Chains, Inc., id. It is aware that certain trademark owners are unhappy that their goods are being sold outside their authorized channels of distribution to discount retailers. This kind of activity is beyond the scope of this legislation and the Committee takes no position on whether such conduct is a violation of other laws.

The Committee has been assured by the chief proponents of this legislation that they, and the trademark owners they represent, will not attempt to use the new remedies provided in this bill for resale price maintenance. See, e.g., Statement of James L. Bikoff, President, International Anti--counterfeiting Coalition, Trademark Counterfeiting Act Hearing supra. To apply for a seizure on an ex parte basis, or to file suit under section 32 of the Lanham Act *(15 U.S.C. § 1114,)*, for the purpose of harassing or punishing a retailer or wholesaler who sells trademark owner's goods at a discount, would be a violation of this assurance, and a violation of the purposes of this legislation. Any party who abuses the seizure provision of proposed section 1116(d) may be liable for wrongful seizure under proposed section 1116(d)(13).

HISTORY OF THE ACT

In the 97th Congress, Peter W. Rodino, Chairman of the Committee on the Judiciary, introduced H.R. 6175, the Trademark Counterfeiting Act of 1982. Due to the lateness in the session, no action was taken on the legislation. On April 3, 1983, Chairman Rodino introduced H.R. 2447, the Trademark Counterfeiting Act of 1983. H.R. 2447, provided for criminal and enhanced civil sanctions against trademark counterfeiting. The bill was referred to the Subcommittee on Crime of the House Committee on the Judiciary, which held three days of hearings on the bil, on October 20, 1983, November 3, 1983, and February 9, 1984. The Subcommittee received testimony and written comments on the legislation from a wide variety of parties. At the October hearing, the witnesses were

[9]
James L. Bikoff, President, International Anticounterfeiting Coalition, Paul Haluza, Director, Governmental Relations and Public Affairs, Motor and Equipment Manufacturers Association, Edward T. Borda, President, Association of General Merchandise Chains, Inc., and Joseph W. Rares, President, American Free Trade Association.
At the November hearing, the Subcommittee heard testimony from Timothy J. Finn, Associate Deputy Attorney General, United States Department of Justice, Commissioner Gerald J. Mossinghoff, Assistant Secretary and Commissioner of Patents and Trademarks, United States Department of Commerce, Richard H. Abbey, Chief Counsel, ustoms Service, United States Department of the Treasury, and Robert G. Widham, President, Stanley Tools Division, Stanley Works.

At the February hearing, Alfred Eckes, Chairman, International Trade Commission, William M. Borchard, Esq., and Robert W. Sacoff, Esq., on behalf of the American Bar Association, Mark Budnitz, Professor of Law, Emory Law School, Kenneth Umans, Esq., and Richard A. Wallen, Esq., testified.

On April 25, 1984, William J. Hughes of New Jersey, Chairman of the Subcommittee on Crime, introduced H.R. 5532, which provided only for criminal sanctions against trademark counterfeiting.

On August 1, 1984, the Subcommittee held one day of markup on H.R. 2447 and H.R. 5532, and adopted an amendment in the nature of a substitute, offered by Mr. Hughes, to H.R. 5532. That amendment provided for civil remedies as well as criminal sanctions. The Subcommittee reported a clean bill. That bill, H.R. 6071, was introduced on August 2, 1984 by Mr. Hughes, Mr. Rodino, Harold Sawyer of Michigan, the ranking Republican member of the Subcommittee, Bruce Morrison of Connecticut, Larry Smith of Florida, Edward Feighan of Ohio, Charles Schumer of New York, E. Clay Shaw, Jr. of Florida, F. James Sensenbrenner, Jr. of Wisconsin, and Nancy Johnson of Connecticut.

On August 8, 1984, the full Judiciary Committee held one day of markup on H.R. 6071. The Committee adopted two minor amendments, amendments, one offered by Mr. Hughes and the other by Edward Feighan of Ohio. See discussion infra. By voice vote, the Committee ordered the bill reported to the full House.

SECTION--BY--SECTION ANALYSIS

The first section of the bill sets forth its short title: the Trademark Counterfeiting Act of 1984.

TITLE 18 AMENDMENT

Section 2 of the bill amends chapter 113 of title 18 of the United States Code (relating to stolen property) by adding a new section 2320. "Use of counterfeit marks." That section, in subsection (a), incorporates by reference conduct proscribed by *15 U.S.C. § 1114*(1)(a) (section 32(1)(a) of the Lanham Act) and *36 U.S.C. § 380* (section 110 of the Olympic Charter Act). It provides that whoever violates those provisions of law, and does so by intentionally using a mark or designation, knowing that such mark or designation is counterfeit, is guilty of a criminal offense.

[10]

As discussed above, there are existing remedies for trademark counterfeiting under the Lanham Act and other civil provisions of the law. This legislation will make the Lanham Act remedies even stronger. The Committee in general supports the longstanding treatment of intellectual property offenses as civil law offenses. Thus, criminal sanctions for intellectual property offenses are appropriate only in the narrowest of circumstances. See Additional Views of Robert Kastenmeier of Wisconsin.

For this reason, the state of mind required to consitute a violation of new section 2320 is the highest possible: "intentional" as to conduct and "knowing" as to circumstances. In other words, the defendant must have not just voluntarily used a counterfeit mark or designation. Such use must have been the defendant's conscious objective or purpose. In addition, the defendant must have an awareness of or a firm belief that the mark is a counterfeit mark. See H. Rep. No. 96--1396, accompanying H.R. 6915, the Criminal Code Revision Act of 1980, 96th Cong., 2d sess. at 33 (1980) (hereinafter cited as Criminal Code Report). Of course, if the prosecution proves that the defendant is "willfully blind" to the counterfeit nature of the mark or designation, it will have met its burden of showing "knowledge." See *United States v. Jewell, 532 F. 2d 697* (9th Cir.), cert. denied *426 U.S. 951 (1976)*. See generally, Criminal Code Report at 36.

The use of the mark or designation must be "in connection with the sale, offering for sale, or distribution of (certain) goods or services." This language is based on a similar limitation in the Lanham Act, which requires use "in connection with the sale, offering for sale, distribution, or advertising of any goods or services...." *15 U.S.C. § 1114*(1)(a).

This requirement limits the scope of the criminal provision in an important way. The Committee does not intend to criminalize noncommercial conduct, such as the simple possession of goods or services with a counterfeit trademark affixed. The counterfeit mark must be used for a commercial purpose; that is, the sale or offering for sale, or distribution of goods or services. While the term "sale" may cover only one transaction, the term "distribution" in this context means sales on a widespread basis. Transfers of counterfeit goods or services without any consideration given are therefore not within the scope of this legislation.

Because it wishes to cover only a narrow range of conduct in this legislation, because of the inchoate nature of conduct

involving only advertising, and because of its First Amendment implications, the Committee has chosen not to cover use of a counterfeit mark or designation in connection with advertising of goods or services. Of course, the advertising of goods or service with counterfeit marks affixed that are otherwise covered by section 2320 may be relevant to the issue of whether the defendant has committed other conduct that is proscribed by section 2320.

For the same reason, the legislation does not incorporate section 32(b)(1) of the Lanham Act *(15 U.S.C. § 1114*(1)(b)). The activities covered by that provision are broader, and less egregious, than the conduct the Committee believes merits criminal and enhanced civil sanctions.

[11]

Proposed section 2320 also punishes an actor who attempts to engage in the proscribed conduct. An attempt is punishable at the same level as a completed offense. Through *18 U.S.C. § 371,* conspiracies to commit an offense under proposed section 2320 are also prohibited.

Because of the wide ranging and potentially serious effects of trademark counterfeiting, the Committee has given the courts the authority to punish such conduct quite severely. An individual who is convicted of a violation of section 2120 may be fined $250,000 or imprisoned for five years, or both. A person other than an individual may be fined $1,000,000.

An individual who has been convicted of an offense under section 2320 and who then violates the section again may be fined $1,000,000 and imprisoned for 15 years. In the same circumstances, a person other than an individual may be fined $5,000,000.

The term "person" is defined in *1 U.S.C. § 1.*

The Committee recognizes that the potential penalties for a violation of section 2320 are extremely high. For example, given the grave risk to health and safety that such conduct may present, or the egregious nature of a defendant's conduct, these high maximum penalties are fully warranted. However, the Committee also recognizes that there are many instances of trademark counterfeiting where no such risk exists, or where the defendant's conduct is not egregious. Court should of course exercise their discretion in imposing penalties that are appropriate under the circumstances.

As noted above, the penalties for a second and subsequent conviction are enhanced. However, these enhanced penalties may be imposed only when the second violation occurs after the defendant has committed and been convicted of a prior violation. Thus, a defendant who violates section 2320 on two separate instances, but who is not convicted of the first violation until after the second one has occurred, is not subject to the enhanced penalties.

Defining the criminal offense to incorporate the elements of section 32(1)(a) of the Lanham Act *(15 U.S.C. § 1114*(1)(a)) means that all defenses and other limitations on relief set forth in the Lanham Act are applicable to the criminal section as well, See, e.g., *15 U.S.C. §§ 1114*(2) and 1115(b).

Subsection (b) of proposed section 2320 exempts documents seized for a trademark counterfeiting prosecution from disclosure under the Freedom of Information Act *(5 U.S.C. § 552).* The committee is concerned about inappropriate release and dissemination of confidential business records. While information about sources of supply, for example, may be relevant to a determination of whether the defendant's goods are counterfeit, they may also provide invaluable, and not otherwise obtainable, business information to a competitor.

The Freedom of Information Act already exempts certain documents, such as trade secrets and commercial and financial information, from release, *5 U.S.C. § 552*(b)(4). However, the documents that may be seized in a trademark counterfeiting investigation, such as lists of sources of supply, may not fall into that category and thus may not be protected.

[12]
Of course, documents are protected only if they are "held by an agency or other entity of the Federal Government in connection with a prosecution" for a violation of proposed section 2320.

This exclusion of documents from release pursuant to the Freedom of Information Act has no effect on the application of that Act in other contexts.

Proposed section 2320 (c) provides that the United States may obtain an order seeking the destruction of any counterfeit articles that the defendant possesses. Before such an order may be granted, the Government must prove that the articles actually bear counterfeit marks or designations. Even if the defendant is ultimately acquitted of the criminal charge, there is no valid public policy reason to allow the defendant to retain goods which are in fact counterfeit. The Committee intends that the court exercise the same options it has in ordering destructions pursuant to *15 U.S.C. § 1118.* In

practice, and in appropriate circumstances, the courts have ordered that counterfeit article given to charitable institutions or to the Federal Government. Rather than destroying goods that may have value, the Committee believes that these goods should be preserved whenever possible, so long as the offending mark or designation is removed.

New subsection (d) of section 2320 defines the term "counterfeit mark." Subparagraph (A) is based on the Lanham Act definition of "counterfeit." *15 U.S.C. § 1127*. A "counterfeit" under the Lanham Act is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." Subparagraph (A) adds two additional criteria. First, the mark must be "used in connection with the sale, offering for sale, or distribution of goods or services." This language is taken from section 32 of the Lanham Act *(15 U.S.C. § 1114)* and limits the scope of the definition to marks in commercial use. See discussion of this language as used in subsection (a) of proposed section 2320 supra. Second, the counterfeit mark must be used on those goods or services for which the genuine mark is registered on the principal register in the United States Patent and Trademark Office.

Subparagraph (B) sets forth a second meaning of "counterfeit mark." It is also based on the Lanham Act definition of "counterfeit," but applies to designations described in section 110 of the Olympic Charter Act *(36 U.S.C. § 380)*. That section gives the United States Olympic Committee the right to sue for unauthorized use of an Olympic designation and to seek the remedies provided in the Lanham Act. Because Olympic designations are not registered on the principal register in the United States Patent and Trademark Office, subparagraph (B) is included to ensure that they are covered by this legislation. This legislation does not otherwise affect the right and remedies provided by the Olympic Charter Act.

Because the Lanham Act does not distinguish between "counterfeits" and other kinds of infringements, there has been virtually no case law defining the term "counterfeit." One recent case, *Montres Rolex, S.A. v. Snyder*, No. 82--6168 (2nd Cir., Sept. 14, 1983), did distinguish between "counterfeits" and "infringements" for purposes of the Customs laws described above. The definition of "counterfeit" in the Customs laws tracks that in *15 U.S.C. § 1127*. The court

[13]
found that infringements are simply "likely to cause confusion," while counterfeits are "substantially indistinguishable" from the registered mark. This is the distinction made in this legislation. It is not enough that the challenged mark be likely to cause confusion in any person's mind. The challenged mark must either be "identical with" or "substantially indistinguishable from" the registered mark.

Subsection (d) provides an exception to the definition of "counterfeit mark" for business practices commonly referred to as "overruns." For example, a manufacturer who has a contract with a trademark owner to make 500,000 pair of blue jeans and to affix the trademark owner's trademark, may in fact make 1 million pair, and affix the mark to the unauthorized 500,000 as well. The trademark owner has "put the wheels in motion" for the manufacturer to make the overruns, and has the means to protect himself or herself. For example, the trademark owner can specify in the contract that the making of overruns shall constitute a breach of the contract, and that the manufacturer shall be liable for liquidated damages if overruns are made. The contract might also specify that the trademark owner has the right to inspect the manufacturer's facilities to ensure that overruns are not being made.

For these reasons, the Committee believes that, while the action of the manufacturer may constitute trademark infringement under the Lanham Act's section 32(1)(a) *(15 U.S.C. § 1114*(1)(a)), it should not be made criminal. The contractual and other civil remedies already existing make it inappropriate to criminalize such practices. The Committee does not, however, take any position about whether such practices are in fact violations of any civil provision of law.

To constitute an exception to the definition of "counterfeit," there need not be a contract between the manufacturer and the trademark owner. Other relationships permitting the use of the mark or designation will also trigger the exception. Indeed, the exception is not limited to manufacturers; producers of goods and services generally are covered.

The exception is limited to goods or services of the type provided for in the contract or other agreement. Thus, in the example described above, if the manufacturer used the trademark not only for the 500,000 pair

of jeans made pursuant to the contract, but also for 500,000 hats, the manufacture of the hats would be an act of counterfeiting. This language distinguishes the exception from the basic definition of "counterfeit mark." In the latter, the spurious mark must be used for goods and services for which the genuine mark is registered on the principal register. In other words, if the mark is registered for "wearing apparel," a trademark is counterfeit if it is used on wearing apparel and otherwise meets the criteria set forth in subsection (d).

The exception, however, applies only to the type of goods or services covered by the contract. In the example described above, the contract permitted the manufacture of blue jeans, not hats. Even if the trademark had been registered for "wearing apparel"----a term encompassing blue jeans and hats----the manufacture of hats would be counterfeit because they were not covered by the contract.

[14]
The term "holder of the right to use such mark" generally refers to the trademark owner, assignees of the trademark owner, and others with a similar relationship to the trademark owner.

The exception applies to goods and services produced while the contract or other relationship was in effect. It also applies to goods and services produced "a reasonable time" after the contract or other relationship is terminated. What constitutes a "reasonable time" will obviously depend on the nature of the business relationship between the parties, the nature of the business itself, and other factors the court deems relevant. The purpose of this language is to protect purchasers of "overruns" who are unaware that the permission to produce the goods or services has been terminated. Once again, the burden should be on the trademark owner to protect himself or herself, in the agreement, against unauthorized use of the articles. To place this burden on unsuspecting purchasers, who may have a good faith relief that the articles are authorized, would be unfair.

It is not unfair, however, to hold criminally liable a purchaser who is aware that the producer no longer has the right to produce such articles. Therefore, the exception does not apply if "the user has knowledge of the termination of the relationship." The word "user," in this context, means anyone who possesses the goods, through the line of distribution, for commercial purposes.

Obviously, if the goods are manufactured during the existence of a valid contract, and the user purchases them knowing that a valid contract exists, the fact that the contract is later terminated is irrelevant. Thus, if the user has knowledge that such a contract was terminated, that knowledge is irrelevant; it does not make the goods counterfeit. It is only where the user knows that the goods were made after the termination of the contract, or were of a different type than those called for by the agreement, that the goods may be considered counterfeit.

The defendant has the burden of proving that the goods in question fall within the exclusion set forth in proposed subsection (d). The Government, in turn, has the burden of proving that the defendant had knowledge of the termination of the relationship.

As noted above, this legislation does not in any way cover so--called "parallel imports" or "grey market" goods, "trade dress" violations, and conduct relating to generic drugs. It is not necessary, therefore, to create a specific exclusion for these kinds of activity.

The other definitions in subsection (d) of proposed section 2320 are self--explanatory. Proposed paragraph (2) defines the term "Lanham Act," and proposed paragraph (3) defines the term "Olympic Charter Act."

LANHAM ACT AMENDMENT

Section 3 of the bill amends the Lanham Act in several respects. First, it amends *15 U.S.C. § 1116* by adding a new subsection (d)(1). In general, section 1116 governs the use of injunctions to protect the rights of trademark owners. The amendment would, for the first time, specifically codify the authority of the Federal courts to

[15]
grant seizures of goods and related marks and designations on an ex parte basis.

Although in recent years, many courts have granted these kinds of seizures, the proponents of the legislation strongly urged that this authority be codified. See, e.g., Statement of James L. Bikoff, President, International Anticounterfeiting Coalition, Trademark Counterfeiting Act Hearings supra.

These parties contended that seizures on an ex parte basis are essential to the full protection of the rights of a legitimate trademark owner. Trademark counterfeiters are often "fly by night" operators, who sell their goods on street corners and who will, if given notice of impending court proceedings, dispose of their goods to someone else in the counterfeiting network or simply destroy them as a cost of doing business and to escape legal liability. In many cases, therefore, noticed applications for injunctions are therefore inadequate to protect the trademark owner's rights. To protect the authority of the courts in these kinds of cases, these parties urged the Committee to codify the courts' authority to grant seizures on an ex parte basis. Id.

In addition, according to these parties, the granting of requests for such seizures has not been uniform in the federal courts; some courts believe that they currently have no authority to order them. Those courts that have ordered seizures on an ex parte basis have relied on a variety of existing laws to do so. Testimony of Robert W. Sacoff, Esq., on behalf of the Section of Patent, Trademark and Copyright Law of the American Bar Association, Trademark Counterfeiting Act Hearings supra.

For example, some courts rely on *Rule 65 of the Federal Rules of Civil Procedure* (relating to injunctions). Other courts have relied on the All Writs Act *(28 U.S.C. § 1651)*. Still others have derived such authority from section 34 of the Lanham Act *(15 U.S.C. § 1116)*. Bainton, Seizure Orders: An Innovative Judicial Response to the Realities of Trademark Counterfeiting, *73 Trademark Rptr. 459 (1983)*.

None of these statues clearly and specifically grants the courts the power to order such seizures. The Committee does not, however, take any position on whether the courts have been exercising their authority appropriately. It is the Committee's purpose in this legislation to ensure that the courts do, in the proper circumstances, have such authority. It is convinced by the testimony of proponents of this legislation that, while the majority of Federal courts have been ordering such seizures, they have not done so uniformly, and that their orders have been based on varying provisions of law.

Most importantly, the Committee is concerned that the courts have not had any guidance on the kinds of procedures to be used for ordering such seizures, and on the kinds of protections that must be afforded defendants in such proceedings.

A seizure is not the same as an injunction, which generally restrains the defendant from acting in a certain way. While the courts have the authority to order "mandatory" injunctions, which require the defendant to act in a certain way, Developments in the Law----Injunctions, *78 Harv. L. Rev. 994, 1061 (1965),* the Committee believes that seizures of the defendant's property, without giving [16] the defendant the opportunity to be heard, present appreciably different and important issues that must be specifically addressed in this legislation. See, e.g., Statement of Professor Mark Budnitz, Trademark Counterfeiting Act Hearings supra.

In cases of application for seizure on an ex parte basis for alleged trademark counterfeiting, for example, the courts are presented only with a trademark owner's claim that the goods in question are counterfeit. The goods are in the possession of the defendant, the applicant has no proprietary interest in them, and the propriety of the defendant's possession will not be determined until a noticed hearing can be held. In such cases, the due process protections must be even greater than where the applicant claims an ownership interest in the matter in the defendant's possession. *Mitchell v. W.T. Grant, 416 U.S. 600 (1974),* Statement of Professor Mark Budnitz, Trademark Counterfeiting Act Hearings supra.

Judicial proceedings of this type present substantial constitutional issues. It is thus essential that the defendant, who is not present at the seizure hearing, be accorded all possible protections against improper seizure of his or her property.

In addition to the constitutional mandate, there are policy reasons for limiting the availability of such seizures. Because of their onerous nature, the Committee intends that seizures on an ex parte basis be used only as a last resort, where no other means are adequate to protect the authority of the court and the integrity of its orders. It is not appropriate to order such a seizure against a reputable business person who will willingly comply with a court order. The essence of the requirements set forth in proposed subsection (d) of section 1116 is that the defendant will not comply with a less drastic court order, such as a temporary restraining order, and that there is no other means of protecting the court's authority than to, without the defendant's consent, and without notice, seize the property in the defendant's possession.

Such a harsh remedy mandates strict controls and protections. They are provided in proposed section 1116(d).

As noted above, proposed subsection (d)(1) sets forth the authority for courts to order such seizures, pursuant to section 1116(a) of title 15. That subsection authorizes the courts to grant injunctions to protect trademark owners' rights, "according to the principles of equity...." Thus, all relevant equitable considerations for the granting of other kinds of preliminary relief are equally applicable here.

The Committee does not intend to preempt Rule 65 completely. Where procedures set forth in Rule 65 are inconsistent with the dictates of proposed section 1116(d), courts should rely on section 1116 as amended by this legislation. However, in those cases where section 1116 is silent, and for precedential value, the courts should look to Rule 65 and to general principles of equity.

Proposed subparagraph (d)(1)(A) authorizes the courts to order seizures on an ex parte basis when the applicant alleges a violation of *15 U.S.C. § 1114* or *36 U.S.C. § 380*. Obviously, no seizure order may be directed against a person who is not a defendant in the action.

[17]
The court must find that it clearly appears from specific facts that the matter to be seized is actually counterfeit. See discussion of proposed section 1116(d)(4)(C) infra.

In addition, the applicant must show that the defendant's conduct consists of "using a mark or designation in connection with the sale, offering for sale, or distribution of goods or services . . .". This language parallels that used in section 32(1) of the Lanham Act *(15 U.S.C. § 1114*(1)) and in proposed section 2320 of this bill. See discussion supra.

Finally, the applicant must show that the defendant either "knew or should have known that such mark or designation is a counterfeit mark...". Whether the defendant "should have known" the nature of the mark is an objective standard; the court must consider the normal and reasonable practices of the business community generally, as well as the specific practices of the defendant.

In applying this standard, the court must be careful not to impose too heavy a burden on the defendant. For example, it may be unreasonable to expect the defendant to train every employee to recognize counterfeits. In addition, some counterfeits are such close copies of the genuine article that only an expert would be able to distinguish them. Statement of Edward T. Borda, President, American General Merchandise Chains, Trademark Counterfeiting Act Hearings supra.

It is also not enough for the trademark owner to simply allege to the defendant that the goods are counterfeit. For example, a trademark owner may assert that the defendant did not obtain the goods from an authorized distributor, and that the goods must therefore be counterfeit. The Committee is aware that discounters often obtain their merchandise from distributors who are not authorized by the trademark owner, but who are nonetheless legitimate. Those goods are not counterfeit and the trademark owner's mere assertion that they are does not make them so. Nor does it satisfy the burden of proving that the defendant "should have known" that the goods were counterfeit.

While seizure on an ex parte basis may be appropriate even when the defendant did not actually know that the goods were counterfeit, but simply "should have known," the recovery of treble damages or profits from such a defendant is not appropriate under this legislation. Thus, this legislation does not permit a recovery in such circumstances. Proposed *15 U.S.C. § 1117*. In such circumstances, a business should not be allowed to retain goods once they have been

found to be counterfeit. However, that business should not be penalized, by an order for treble recovery, for possessing those goods unless the business person intended to sell the goods and knew that they were counterfeit.

Proposed subparagraph (B) describes the articles that are subject to a seizure on an ex parte basis: "goods and marks and designations involved in such violation and the means of making such marks and designations, and documents relating to the manufacture, sale, or receipt of things involved in such violation."

As noted above, a defendant has no legitimate right to retain counterfeit goods and marks and designations and the means of making such marks and designations. Seizure of such matter, on

[18]

an ex parte basis if necessary, is appropriate. Seizure of related documents is also appropriate, when necessary to avoid "frustrating implementation of the trademark owner's statutory and common law rights." Seizure Orders, supra, at 464. When needed to protect the court's authority, seizures of documents may also be carried out on an ex parte basis.

It is important, to limit the scope of such seizures. This legislation does not permit a wholesale search of the defendant's business premises and records. Several witnesses before the Subcommittee stated their concern that seizures on an ex parte basis would be used not only to seize counterfeit goods, but also to obtain the defendant's confidential business records, including sources of supply. Records identifying sources of supply could be used to retaliate against business people who, against the wishes of the trademark owner, sell goods to legitimate discounters. See, e.g., Statement of Edward T. Borda, President, Association of General Merchandise Chains, Trademark Counterfeiting Act Hearings supra.

The Committee intends to protect the confidentiality of the defendant's records of legitimate transactions. Only those documents "relating to the manufacture, sale, or receipt of things involved in" a violation described in proposed subsection (d)(1)(A) may be seized pursuant to an order granted on an ex parte basis. Further protection of the defendant's business records is provided in proposed paragraphs (6), (10), and (12) of subsection (d). See discussion infra.

Proposed subsection (d)(1)(C) set forth the same basic definition of "counterfeit mark" used in proposed section 2320 of title 18. The same limitations upon and exclusions to that definition apply here. See discussion supra.

Proposed subsection (d)(2) requires the applicant for a seizure on an ex parte basis to first notify the United States Attorney for the district where the order is sought. Since the legislation gives the Federal Government the authority to bring criminal prosecutions against trademark counterfeiters, the Committee believes it is necessary to protect the integrity of any investigations or prosecutions under proposed section 2320. Before any seizures in a civil proceeding are made that might warn a defendant that his or her activities have been discovered, the United States Attorney should be given the opportunity to participate in the civil proceedings and explain how the criminal case might be jeopardized. It is only where the civil proceedings "may affect evidence" in the criminal case that the prosecutor may appear.

The applicant must give the United States Attorney "timely notice" of the seizure application. The term "timely" means whatever is reasonable under the circumstances. The Committee recognizes that often plaintiffs in trademark counterfeiting cases need to obtain orders for such seizures on an expedited basis. Otherwise, the alleged counterfeiter may abscond with the counterfeited goods, or may dispose of them in a way that puts them beyond the court's power. In such circumstances, the applicant might request that a hearing be held simultaneously with the filing of the application. "Timely" notice in those circumstances may mean serving the prosecutor on the way into the courthouse.

If, however, there is no need to expedite the seizure, and the hearing is set for two days after the application is filed, there is no

reason why the applicant cannot give the United States Attorney two days notice.

It is within the court's discretion to decide whether, under the circumstances, notice to the prosecutor has been "timely."

It is the responsibility of the United States Attorney, of course, to ensure that when it is appropriate, a prosecutor will appear in court for the seizure hearing. So long as notice has been timely, neither the court nor the applicant has any responsibility to inquire into whether a prosecutor will appear.

The Committee recognizes that in many cases, there may be no need for notice to the United States Attorney. Where a criminal investigation of the counterfeiting of the applicant's mark is pending, it is likely that the applicant will already have been contacted by the investigators, and the prosecutors will already be aware of the applicant's plans in the civil proceedings. In these cases, notice will be little more than a formality. It is the cases where there has been no such communication between the applicant and the prosecutor's office that such notice is needed.

Paragraphs (d)(3) and (4) set forth the requirements for the application for an order for a seizure on an ex parte basis. In large part, these requirements are based on those of *Rule 65 of the Federal Rules of Civil Procedure* and case law interpreting it. The requirements have been modified where appropriate to conform them to the circumstances peculiar to seizures on an ex parte basis. As noted above, where no procedures are set forth in this bill, those required by Rule 65 should be followed.

The application must be based on either an affidavit or a verified complaint. The words "verified complaint" were added to paragraph (e) by an amendment offered by Mr. Feighan in Committee markup, to conform the procedure to that of *Rule 65 of the Federal Rules of Civil Procedure.*

Both an affidavit and a verified complaint are filed under oath. This requirement, and the fact that the defendant is not present in court, make it essential for the court to rely, wherever possible, on the personal knowledge of the applicant. It will not do, for example, for the lawyer representing the trademark owner to state, "upon information and belief" facts that are within the client's or investigator's personal knowledge and which should have been stated in the affidavit of the client or investigator.

Ordinarily, the preference for personal knowledge will preclude the reliance on hearsay in the affidavit or verified complaint. There are, however, circumstances where the use of hearsay may be appropriate, because crucial information could not otherwise be obtained. Where, for example, the lawyer has obtained information from a confidential source whose identity cannot be revealed publicly, the court may accept hearsay in an affidavit or verified complaint. See generally, Wright & Miller, Federal Practice and PROCEDURE, Civil § 2952, at 514--16 (1973).

The affidavit or verified complaint must establish "facts sufficient to support the findings of fact and conclusions of law required" for the court to order a seizure on an ex parte basis. As required by paragraph (4) of proposed subsection (d), the court may order such a seizure only where it "clearly appears from specific

facts" that the circumstances described in that paragraph exist. See discussion supra.

Subparagraph (B) of proposed subsection (d)(3) simply states that the applicant must provide the court with all additional information needed for the court's order. See discussion of proposed subsection (d)(5) infra.

Paragraph (4) sets forth the factors the court must consider in deciding whether to grant an application for a seizure on an ex parte basis. The court must decide whether it "clearly appears from specific facts" presented by the applicant that these factors exist. The standard for the court's consideration is taken from *Rule 65(b) of the Federal Rules of Civil Procedure*, relating to temporary restraining orders. The standard was changed from one of "probable cause" to "clearly appears from specific facts" by an amendment offered by Mr. Hughes at Committee markup.

Subparagraph (A) of proposed subsection (d)(4) provides that the court may not order a seizure on an ex parte basis if there is another, less onerous method of protecting the court's power. For instance, if a temporary restraining order or

a preliminary injunction would be adequate, the court should not grant an application under this subsection. Certainly where the giving of notice would not be detrimental to the applicant's case, seizure as authorized by subsection (d) is not permitted.

Pursuant to subparagraph (B), the court may not grant a seizure order if the applicant has publicized the seizure. According to testimony at the Subcommittee's hearings, publicity about a seizure, and the allegation that a business deals in counterfeit goods, can cause significant damage to the reputation of a business against whom a seizure is directed. Statement of Edward T. Borda, President, Association of General Merchandise Chains, Trademark Counterfeiting Act Hearings supra.

Obviously, where the application for a seizure is granted on an ex parte basis, the business' owner has not been notified of the request for a seizure and thus has no chance to respond to the allegations. To protect businesses from such damage, at least until a noticed hearing is held and the business' owner can respond, the applicant may not publicize the application for a seizure. This restriction continues only until the noticed hearing is held, unless the court in its discretion deems it necessary to continue it. See discussion of proposed subsection (d)(6) infra.

Subparagraphs (C) and (D) set forth two traditional requirements for the granting of equitable relief: it is likely that the applicant will succeed on the merits of the case, and the applicant will suffer an immediate and irreprable injury if the seizure is not ordered.

The term "merits" refers to the applicant's cause of action under section 32 of the Lanham Act *(15 U.S.C. § 1114)*. Thus, for example, to obtain a seizure order, the applicant must show that it is "likely" that the matter to be seized is counterfeit.

The kinds of injury the applicant may suffer will vary, of course, depending on the kind of articles alleged to be counterfeited and on the kind of business the applicant is in. For example, if the quality of the allegedly counterfeited goods is so inferior that significant and long term damage to the applicant's reputation is inevitable if

[21]

the goods are sold, the applicant may suffer immediate and irreprable injury.

The applicant must be precise in describing the location of the matter to be seized. Subparagraph (E) requires the court to find that the matter will be located at the place identified by the applicant. The Committee is aware, however, that some defendants may be itinerant and may sell their goods on the open streets. It may be difficult for the applicant to identify exactly where the defendant is conducting business. While the courts should thus be flexible in applying subparagraph (E), it is not sufficient for the applicant to state that the matter may be located "somewhere in downtown Washington, D.C." and that the precise location cannot be determined until the seizure takes place.

The name of a trademark counterfeiter may be unknown, and it may be difficult to anticipate who will have possession of the matter at the time of the seizure. While the bill therefore does not mandate it, the courts should require such an identification where the applicant is able to make it.

Subparagraph (F) sets forth a third traditional equitable consideration for the granting of equitable relief: that the harm to the applicant if the request for a seizure is denied outweighs the harm to the alleged counterfeiter if the request is granted. For example, the court should consider any damage to the defendant's reputation and the invasion of the defendant's privacy if seizure is granted, and should weigh these factors and harm to the applicant under subparagraph (D).

Subparagraph (G) restates a fourth traditional equitable consideration: the effect on the public interest if the seizure is ordered. That the public interest would be enhanced if the request is granted is irrelevant if

the applicant does not meet all of the other requirements for seizure. Ordinarily, the only instance where the public interest would be involved is where the applicant otherwise qualifies for such relief. If the court determines that, nevertheless, the public interest would be harmed by the granting of the request, it must be denied. For instance, if the court determines that to grant the application would jeopardize an ongoing criminal investigation, which would have far--reaching effects on consumers generally, it may deny the request.

The Committee anticipates that in some cases, the dispute will be a purely private matter, and that there will be no effect at all on the public interest. In these cases, if the applicant otherwise qualifies for a seizure order, the request should be granted.

Pursuant to subparagraph (H), no application for a seizure on an ex parte basis may be granted unless the matter "will

be destroyed, moved, hidden, or otherwise made inaccessible." This requirement responds to the complaints of witnesses at the Subcommittee's hearings that seizures are needed on an ex parte basis because otherwise, some defendants who are notified of pending legal action will attempt to remove themselves and the goods from the reach of the court. See discussion supra.

The most obvious example of proof sufficient to satisfy subparagraph (H) is that the defendant has attempted to evade the judicial process in the past. If no such action on the defendant's part will
[22]
occur, there is no reason for the defendant not to be notified of the seizure request.

Paragraph (5) describes the matters that must be set forth in the court's order granting a seizure on an ex parte basis. The order must be supported by findings of fact conclusions of law relating to the criteria required by paragraph (4). It must particularly describe the matter to be seized, and also describe the locations where the matter will be found.

The order must also state when the seizure shall take place. Because of the often transitory nature of counterfeiters and counterfeit goods, the court may permit the seizure to take place within seven days of the issuance of the order. The applicant may request this amount of time in which to make the seizure in the belief that if the matter is not at the identified location on one day, it will be there shortly thereafter.

The order must also state the amount of security that paragraph (8) of proposed subsection (d) requires the applicant to provide. See discussion infra.

Finally, the order must state the date of the noticed hearing required by proposed subsection (d)(11)(A). Service of the order on the defendant just before the seizure occurs, as required by proposed subsection (d)(10), will constitute notice to the defendant of the hearing.

Paragraph (6) requires the court to take appropriate action to protect the defendant from publicity about a seizure and an order permitting it. The court's power under this paragraph extends only to publicity "by or at the behest of the plaintiff..." The purpose of the court's order is to protect the reputation of the defendant until he or she can appear in court. Thus, in general, the court's power extends only until the time a noticed hearing is held. At that time, the defendant will presumably be able to present his or her side of the story to the court, thus attempting to counter any negative publicity from the plaintiff's account of the facts. The Committee believes, however, that unusual circumstances may make it necessary for the court to continue to protect the defendant from publicity by or at the behest of the plaintiff. Such circumstances might exist, for example, where the plaintiff is vastly more powerful than the defendant in terms of money, reputation, and other resources. Paragraph (6) empowers the court to use its discretion to determine whether such protections should be continued beyond the date of the noticed hearing.

The Committee is of course aware that the First Amendment ultimately dictates the extent of any restrictions on publicity in legal proceedings. Use of the term "appropriate action" ensures that any restrictions imposed pursuant to this paragraph will be consistent with the demands of the Constitution.

Pursuant to paragraph (7), the court must issue a protective order before any documents are seized

under this subsection. As noted above, the Committee intends that seizures under this subsection not be used as a subterfuge for obtaining the defendant's confidential business records, such as sources of supply. Even incident to a legitimately requested seizure, there is a danger that such records will be improperly revealed. Paragraph (7) therefore prevents the disclosure of such records and their contents to any

[23]

third party, including the plaintiff and the plaintiff's counsel, except pursuant to the procedures set forth in paragraph (10) and paragraph (12), discussed infra.

Thus, the court's protective order must also provide that any documents seized from the defendant be returned, and that no information in them be retained once the court's seizure order has lapsed or the litigation has ended. Only if documents fall into any of the categories set forth in *15 U.S.C. § 1118,* relating to destruction of infringing articles, may they be retained. Ultimately, of course, any such documents would be destroyed or otherwise disposed of pursuant to section 1118.

The proscription against retention of any information in the documents does not, of course, mean that the court or the parties may not quote from the documents in filings relating to the case or otherwise use them in a manner appropriate to the course of the litigation. It simply means that the documents are the property of the defendant and, unless otherwise prohibited here, the defendant has a right to their return.

If the court believes that even these restrictions are insufficient to protect the defendant, paragraph (7) authorizes it to impose more stringent restrictions.

Paragraph (8) requires the plaintiff to post a security bond in an amount that the court determines is adequate to compensate the defendant if the seizure is later found to be wrongful and the defendant is awarded damages pursuant to paragraph (13), discussed infra. Because the defendant is not present in court to represent what his or her losses would be in the event of a wrongful seizure, the court should be careful to set an adequate bond.

Pursuant to paragraph (9), the court must order the seizure order and any supporting documents sealed until the noticed hearing is held. This is to prevent any damage to the defendant's reputation until the defendant has the chance to contest the seizure order. Obviously, though, the defendant must be provided with a copy of the order and be permitted to review the supporting documents in order to prepare for the hearing and further court proceedings.

Paragraph (10) permits either a United States marshal or another law enforcement officer to carry out the seizure. The Committee strongly prefers that the seizure be carried out by a Federal marshal, who is directly under the control of the Federal judiciary. However, it does recognize that, especially in large metropolitan areas, the Marshal's Service may not have the resources to carry out seizures of counterfeit trademarked goods as promptly as necessary. In these cases, the court may order that the seizure be executed by another law enforcement officer. The court must exercise appropriate control over such officer, to ensure that Federal standards for carrying out the seizure are upheld.

The Committee recognizes that the officer executing the seizure may not have sufficient background to determine what materials are relevant to the plaintiff's case. Thus, it may be necessary for the plaintiff to accompany the officer during the seizure. However, the plaintiff's need must be balanced against the rights of the defendant, who has not yet been heard in court, to protection of his or her trade secrets and other confidential information. Thus, where appropriate, the court must issue a protective order so that

[24]

the defendant's trade secrets and other confidential information are not revealed. For example, the court may in its discretion preclude the plaintiff from having access to such material during the seizure. In extreme cases, the court may preclude the plaintiff from accompanying the law enforcement officer during the seizure. Once the seizure is executed, the plaintiff's access to the defendant's documents is governed by paragraph (12), discussed infra.

Finally, paragraph (10) requires the person making the seizure to follow the Federal Rules of Criminal Procedure, insofar as practicable, in executing the seizure and in making a return after the seizure has taken place. While in certain instances, a procedure applicable to a criminal case will not be readily

applicable to a civil case, the majority of the requirements of *Rule 41 of the Federal Rules of Criminal Procedure* will be appropriate and must be followed.

Paragraph (11)(A) requires the court to hold a noticed hearing on the propriety of the seizure order. The defendant will have received notice of the hearing by service of the seizure order. The hearing may be waived, if all parties agree.

The hearing must be held no sooner than 10 days, and no later than 15 days, after the issuance of the seizure order. The flexibility of the hearing date is intended to accommodate the seven day period after the issuance of the order during which the seizure may be executed. To require that the hearing be held 10 days after the order was issued would leave only three days for preparation for the hearing if the seizure was effected seven days after the issuance of the order. This would be unfair to the defendant, who presumably had no notice of the seizure order until the seizure was effectuated. The court, at the time of the application for the seizure, must determine when it is likely that the seizure will take place, and the relative abilities of the parties to prepare for the noticed hearing, in setting the date for that hearing.

Of course, either party may request a delay in the hearing. The plaintiff must show good cause for a continuance, since at this point in the proceedings the hardship is with the defendant whose goods have been seized. For the same reason, it is not necessary to require the defendant to show cause for a continuance.

At the hearing, the plaintiff, of course, has the burden of showing that the seizure order was justified and that it continues to be justifiable to hold the defendant's goods. It may be the case that certain facts or circumstances that apparently existed at the time the seizure order was issued no longer exist, or the defendant can prove that they never existed. Nevertheless, if the plaintiff can continue to show enough evidence to satisfy the requirements of proposed subsection (d)(4), continuance of the seizure order is justified. Otherwise, the seizure order must be dissolved or modified.

Of course, the court has the power to retain goods that are proven to be counterfeit. If the defendant does not contest this issue, the court should deal with the goods pursuant to *15 U.S.C. § 1118.*

Subparagraph (B) permits the court to modify normal discovery time limits, if necessary, to accommodate the short hearing schedule.

[25]

Paragraph (12) dictates the procedure for protecting confidential documents that are seized pursuant to subsection (d). Those documents must be placed in the court's custody. The court must then determine whether any of the documents are relevant and material to the case and, to protect their confidentiality, shall do so without disclosing the material to any of the parties. There is one exception to this restriction: where the court does not have enough facts to make a decision about the relevance or materiality of any document, it may consult with the parties and, if necessary, disclose its contents to them.

The court may, of course, delegate the responsibility for making such a determination. For instance, in cases where a large number of documents must be reviewed, the court might appoint a special master pursuant to *Rule 53 of the Federal Rules of Civil Procedure.* If there are only a few documents, the court may wish to make the determination itself.

In any case, once any documents have been ruled relevant and material, they shall be turned over to the parties to use to prepare for the hearing required by paragraph (11) and for the rest of the case.

Given the short amount of time between the seizure and the paragraph (11) hearing, the court should make the determination quickly, so that the parties will have sufficient time to review the disclosed documents and prepare for the hearing.

The Committee has created detailed procedures governing, and stringent protections for defendants who are subject to, seizures on an ex parte basis. It has done so to ensure full due process protections to absent defendants. To complete the necessary protections, paragraph (13) permits a defendant who is the subject of a wrongful seizure, and who suffers damage as a result, to recover appropriately in a civil action.

A defendant who successfully proves that he or she has suffered damage from a wrongful seizure is entitled to recover damages for lost profits, cost of materials, unjust enrichment, loss of good will, and whatever other relief the court deems appropriate. The defendant may also recover a reasonable attorney's fee.

The term "wrongful seizure" is deliberately not defined in the statute. The court must determine whether the circumstances of a particular case constitute a "wrongful seizure." The Committee intends, however, that the term encompass at least three situations. First, a seizure will be considered wrongful if the applicant acts in bad faith in seeking it. For example, it would constitute bad faith for an applicant to seek a seizure order in an effort to maintain retail prices at a certain level, and to prevent the discounting of those prices.

Second, a seizure must be considered "wrongful" when the matter seized is not counterfeit. In such a case, it does not matter that the plaintiff believed in good faith that the matter was counterfeit. As between two relatively innocent parties, the defendant is the more innocent. The plaintiff initiated the seizure action and must suffer the consequences.

Third, a seizure must be considered "wrongful" to the extent that it is executed improperly. Even if the goods are counterfeit, and even if the defendant has acted in bad faith in copying the

[26]
plaintiff's trademark, if, for instance, the law enforcement officer executing the search unnecessarily destroys the defendant's property, or the plaintiff violates a court order prohibiting access to confidential business records, the seizure is "wrongful" to this extent and the defendant is entitled to recover damages and other relief.

The result of the wrongful seizure action is, of course, independent of the result of the plaintiff's civil suit against the defendant.

The second part of Section 3 of the bill amends *15 U.S.C. § 1117,* which relates to recovery of profits, damages, and costs. That section now leaves it to the court's discretion whether to increase the plaintiff's recovery beyond actual profits or damages. It does not, however, give the court guidelines for its decision whether to order an increased recovery.

The amendment to section 1117 requires the court to grant the plaintiff treble damages or profits, and a reasonable attorney's fee, where the defendant has violated section 1114(a) of title 15 and has done so by "intentionally using a mark or designation knowing that the mark or designation is counterfeit." The use must also be "in connection with the sale, offering for sale, or distribution of goods or services."

The mandate to the court is not, however, without an important limitation. The court has the discretion to deny a plaintiff's request for treble damages or profits if extenuating circumstances exists. What constitutes extenuating circumstances will depend on the particular case. For instance, it may not be appropriate to impose treble damages where

the defendant is an unsophisticated individual operating on a small scale, whose conduct posed no risk to the public's health or safety, and the imposition of treble damages would destroy the defendant financially, thus impairing any ability to support his or her family.

This amendment responds to the concerns of trademark owners that, even where manifestly appropriate, courts have not routinely increased the recovery under section 1114. See discussion supra.

The third part of section 3 of the bill amends *15 U.S.C. § 1118,* which relates to destruction of infringing articles. It is similar in purpose to proposed subsection (d)(2) of section 1116 of title 15, discussed above. The amendment to section 1118 requires any party seeking an order for destruction of infringing articles to notify the United States Attorney of the request. The prosecutor may seek a hearing on the request or, if a hearing has already been requested, may participate in it. The standard governing whether the Government may intervene is the same as that required in the comparable amendment to *15 U.S.C. § 1116:* intervention is warranted when the destruction "may affect evidence of an offense against the United States."

As with proposed section 1116(d)(2), the applicant for a destruction order must give the United States Attorney "timely notice." Once again, this term should be interpreted to mean "reasonable under the circumstances." However, while an application for a seizure on an ex parte basis may need to be heard on an emergency basis, it is not likely that there will be an urgency to an application for destruction. "Timely notice" under section 1118, then, will generally mean whatever the normal requirement for notice of a hearing in a civil case is.

[27]

OVERSIGHT FINDINGS The Committee makes no oversight findings with respect to this legislation. In regard to clause 2(1)(3)(D) of rule XI of the Rules of the House of Representatives, no oversight findings have been

submitted to the Committee by the Committee on Government Operations.

NEW BUDGET AUTHORITY

In regard to clause 2(1)(3)(B) of rule XI of the Rules of the House of Representatives, H.R. 6071

creates no new

budget authority or increased tax expenditures for the Federal Government.

INFLATIONARY IMPACT STATEMENT

In regard to clause (1)(4) of rule XI of the Rules of the House of Representatives, the Committee finds

that the bill will

have no foreseeable inflationary impact on prices or costs in the operation of the national economy.

FEDERAL ADVISORY COMMITTEE ACT OF 1972

The Committee finds that this legislation does not create any new advisory committees within the

meaning of the

Federal Advisory Committee Act of 1972.

COST ESTIMATE

In regard to clause 7 of rule XIII of the Rules of the House of Representatives, the Committee agrees

with the cost

estimate of the Congressional Budget Office. STATEMENT OF THE CONGRESSIONAL BUDGET

OFFICE

U.S. CONGRESS,
CONGRESSIONAL
BUDGET OFFICE,
*Washington, DC, August*
28, 1984.

Hon. PETER W. RODINO, Jr.
*Chairman, Committee on the*
*Judiciary, House of*
*Representatives, Washington,*
*DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 6071, the Trademark Counterfeiting Act of 1984, as ordered reported by the House Committee on the Judiciary, August 8, 1984.

We estimate that no significant costs to the federal government, or to state or local governments will result from enactment of this bill.

H.R. 6071 provides criminal penalties and increased civil penalties for persons who knowingly use a counterfeit mark.

The bill applies to all goods and services with identifying marks that are registered with the U.S. Patent and Trademark Office, and to any unauthorized use of Olympic symbols. Convicted individuals would face up to 15 years in prison and up to $1 million in fines for repeated offenses. Corporation convicted of a repeat offense would face a fine of up to $5 million. The bill provides that the court may order the seizure of items involved in a violation. Claimants in civil

[28]

actions may recover the greater of triple the claimant's damages or triple the defendant's profits, plus a reasonable attorney's fee.

Based on information provided by the Department of Justice, we expect that enactment of this bill will not result in any significant increase in agency workloads or costs. Most of the cases would be subject to civil adjudication, where the costs would be absorbed by one of the parties. The collection of fines may result in some additional receipts to the federal government, althoughthere is no reliable basis for estimating these amounts.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

ERIC HANUSHEK

(For Rudolph G. Penner).

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

**TITLE 18, UNITED STATES CODE**

*****

**PART 1  .CRIMES**

*****

**CHAPTER 113   STOLEN PROPERTY**

Sec.

2311. Definitions.

*****

*2320. Use of counterfeit marks.*

*****

*§ 2320. Use of counterfeit marks*

(a) *Whoever engages or attempts to engage in conduct for which section 32(1)(a) of the Lanham Act (15 U.S.C. 1114(1)(a)) or section 110 of the Olympic Charter Act (36 U.S.C. 380) provides a civil remedy, by internatinally using a mark or designation, knowing such mark or designation is a counterfeit mark, in connection with the sale, offering for sale, or distribution of goods or services shall, if an individual, be fined not more than $250,000 or imprisoned not more than five years, or both, and, if a person other than an individual, be fined not more than $1,000,000. In the case of an offense by a person under this section which occurs after that person is convicted of another offense under this section, the person convicted, if an individual, shall be fined not more than $1,000,000 or imprisoned not more than fifteen years, or both, and if other than an individual, shall be fined not more than $5,000,000.*

[29]

(b) *Any documents seized and held by an agency or otherity of the Federal Government in connection with a prosecution under this section are exempt from disclosure under section 552 of title 5 of the United States Code (commonly referred to as the "Freedom of Information Act").*

(c) *Upon a showing that any articles in the possession of a defendant inprosecution under this section bear counterfeit marks or designations, the United States may obtain an order for the destruction of such articles.*

(d) *For the purposes of this section*
(1) *the term "counterfeit mark" means*
(A) *a spurious mark which is used in connection with the sale, offering for sale, or distribution of goods or services and which is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office; or*
(B) *a spurious designation which is identical with, or substantially indistinguishable from, a designation as to which the remedies of the Lanham Act are made available by reason of section 110 of the Olympic Charter Act;.*
*but such term does not include any mark or designation used in connectiowith goods or services of which the manufacture or producer was, at the time of the manufacture or production in question or a reasonable time before such manufacture or production, in a contractual or other relationship, permitting the use of the mark of designation for the type of goods or services so manufactured or produced, with the holder of the right to use such mark or designation, unless the user has knowledge of the termination of the relationship; and*
(2) *the term "Lanham Act" means the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes," approved July 5, 1946 (15 U.S.C. 1051 et seq.); and*
(3) *the term "Olympic Charter Act" means the Act entitled "An Act to incorporate the United States Olympic Association," approved September 21, 1950 (36 U.S.C. 371 et seq.)*

\*\*\*\*\*ACT OF JULY 5, 1946

AN ACT To provide for the registration and protection of trade--marks used in commerce, to carry out the provisions of certain international conventions, and for other purposes

\*\*\*\*\*

TITLE VI    REMEDIES

\*\*\*\*\*

SEC. 34. (a) The several courts vested with jurisdiction of civil acarising under this Act shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of

the registrant of a mark registered in the Patent and Trademark Office. Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction. Any such injunction granted upon hearing, after notice to the defendant, by any district court of the United States, may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found, and shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by the court by which such injunction was granted, or by any other United States district court in whose jurisdiction the defendant may be found.

(b) The said courts shall have jurisdiction to enforce said injunction, as herein provided, as fully as if the injunction had been granted by the district court in which it is sought to be enforced. The clerk of the court or judge granting the injunction shall, when required to do so by the court before which application to enforce said injunction is made, transfer without delay to said court a certified copy of all papers on file in his office upon which said injunction was granted.

(c) It shall be the duty of the clerks of such courts within one month after the filing of any action, suit, or proceeding arising under the provisions of this Act to give notice thereof in writing to the Commissioner setting forth in order so far as known the names and addresses of the litigants and the designating number or numbers of the registration or registrations upon which the action, suit, or proceeding has been brought, and in the event any other registration be subsequently

included in the action, suit, or proceeding by amendment, answer, or other pleading, the clerk shall give like notice thereof to the Commissioner, and within one month after the decision is rendered, appeal taken or a decree issued the clerk of the court shall give notice thereof to the Commissioner, and it shall be the duty of the Commissioner on receipt of such notice forthwith to endorse the same upon the file wrapper of the said registration or registrations and to incorporate the same as a part of the contents of said file wrapper.

*(d)(1)(A) In the case of a civil action arising under section 32(1)(a) of this Act (15 U.S.C. 1114) or section 110 of the Act entitled "An Act to incorporate the United States Olympic Association," approved September 21, 1950 (36 U.S.C. 380) with respect to a violation which consists of using a mark or designation in connection with the sale, offering for sale, or distribution of goods or services, if the user knew or should have known that such mark or designation is a counterfeit mark the court may, upon ex parte application, grant an order under subsection (a) of this section pursuant to this subsection.*

*(B) Such order may provide for the seizure of goods and marks and designations involved in such violation and the means of making such marks and designations, and documents relating to the manufacture, sale, or receipt of things involved in such violation.*

*(C) As used in this subsection the term "counterfeit mark" means*

*(i) a counterfeit of a mark registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed; or*

*(ii) a spurious designation which is identical with, or substantially indistinguishable from, a designation as to which the remedies of this Act are made available by reason of section 110 of the Act entitled "An Act to incorporate the United States Olympic Association," approved September 21, 1950 (36 U.S.C. 380);*

*but such term does not include any mark or designation used in connection with goods or services or which the manufacturer or producer was, at the time of the manufacture or production in question or a reasonable time before such manufacturer or production, in a contractual or other relationship, permitting the use of the mark or designation for the type of goods or services so manufactured or produced, with the holder of the right to use such mark or designation, unless the user has knowledge of the termination of the*

*relationship.*

*(2) The court shall not receive an application under this subsection unless the applicant has given timely notice of the application to the United States attorney for the judicial district in which such order is sought. Such attorney may participate in the proceedings arising under such application if such proceedings may affect evidence of an offense against the United States.*

*(3) The application for an order under this subsection shall*

*(A) be based on affidavit or the verified complaint establishing facts sufficient to support the findings of fact and conclusions of law required for such order; and*

*(B) contains the additional information required by paragraph (5) of this subsection to be set forth in such order.*

*(4) The court shall not grant such an application unless the court finds that it clearly appears from specific facts that*

*(A) an order other than an order issued under this subsection is not a dee to achieve the purposes of section 32 of this Act (15 U.S.C. 1114):*

*(B) the applicant has not publicized the requested seizure;*

*(C) success on the merits by the applicant is likely;*

*(D) an immediate and irreparable injury will occur if such seizure is noordered;*

*(E) the matter to be seized will be located at the place identified in application;*

*(F) the harm to the applicant of denying the application outweighs the to the person against who seizure would be ordered of granting the application;*

*(G) the public interest would not be seriously adversely affected by granting the application; and*

*(H) the matter subject to such an order will be destroyed, moved, hidden, or otherwise made inaccessible.*

*(5) An order under this subsection shall set forth*

*(A) the findings of fact and conclusion of law required for order;*

*(B) a particular description of the matter to be seized and a description of each place at which such matter is to be seized;*

*(C) the time period, which shall end not later than seven days after the date on which such order is issued, during which the seizure is to be made;*

*(D) the amount of security required to be provided under this subsection; and*

*(E) a date for the hearing required under paragraph (11) of this subsection*

*(6) The court shall take appropriate action to protect the person against whom an order under this subsection is directed from publicity, by or at the behest of the plaintiff, about such order and any seizure under such order until the end of the hearing required under paragraph (11) of this subsection and may continue such action in the court's discretion after such hearing.*

*(7) Documents may be seized under this subsection only if the court enters a protective order forbidding the disclosure of any such documents, or the contents thereof, to any third party and requiring that the documents so seized be treated as confidential and not made available to the parties except under paragraph (12) of this subsection. The protective order shall also provide that all documents so seized, other than any matter disposed of under section 36 of this Act (15 U.S.C. 1118), shall be returned to the person from whose custody such documents were seized and no information contained in such documents shall be retained after the order has lapsed or such litigation is concluded. The court may, for good cause shown, provide greater protection for the person from whom such documents were seized.*

*(8) A person obtaining an order under this subsection shall provide the security determined adequate by the court for the payment of such damages as any person may recover as a result of a wrongful seizure under this subsection.*

*(9) An order under this subsection, together with the supporting documents, shall be sealed until the party in possession of the matter seized has an opportunity to contest such order, except that any person against whom such order is issued shall have access to such order and supporting documents after the seizure has been carried out.*

*(10) The court shall designate a United States marshal or other law enforcement officer to serve a copy of the order under this subsection and then to carry out the seizure under such order. The court shall issue orders when appropriate to protect the defendant from undue damage from the disclosure of trade*

secrets or other confidential information kept in the course of business, including an order restricting the access of the applicant (or any agent or employee of the applicant) to such secrets or information. The person carrying out the seizure shall in doing so follow, insofar as practicable, the requirements the Federal Rules of Criminal Procedure impose for the execution and return with inventory of a warrant for search and seizure, as though the seizure ordered under this subsection were pursuant to such a warrant.

(11)(A) The court shall hold a hearing, unless waived by all the parties, on the date set by the court in the order of seizure. That date shall be not sooner than ten days after the order is issued and

not later than fifteen days after the order is issued, unless the applicant for the order shows good cause for another date or unless the party against whom such order is directed consents to another date for such hearing. At such hearing the party obtaining the order shall have the burden to prove that the facts supporting findings of fact and conclusions of law necessary to support such order are still in effect. If that party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

(B) In connection with a hearing under this paragraph, the court may make such orders modifying the time limits for discovery under the Rules of Civil Procedure as may be necessary to prevent the frustration of the purposes of such hearing.

(12) Documents seized under this subsection shall be placed in the custody of the court. The court may make such documents available to the attorneys of record for all parties in the civil action, giving due consieration to the need to protect confidential information, except that the court shall not disclose to such attorneys any such document not determined relevant and material to such civil action unless the court finds that the participation of such attorneys is necessary to make such determination. Insofar as practicable documents to be made available under this paragraph shall be made available early enough to permit the parties to prepare for the hearing required under paragraph (11) of this subsection.

(13) A person who suffers damage by reason of a wrongful seizure under this subsection may commence a civil action against the applicant for the order under which such seizure was made, and in such civil action shall recover such relief as may be appropriate, including damages for lost profits, cost of materials, unjust enrichment, and loss of good will, and a reasonable attorney's fee.

SEC. 35. When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount,
and shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 32(1)(a) of this Act (15 U.S.C. 1114(1)(a) or section 110 of the Act entitled "An Act to incorporate the United States Olympic Association," approved September 21, 1950 (36 U.S.C. 380) which consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 34(d) of this Act (15 U.S.C. 1116(d)), in connection with the sale, offering for sale, or distribution of goods or services. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum

as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

SEC. 36. In any action arising under this Act, in which a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established, the court may order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of the defendant, bearing the registered mark or any reproduction, counterfeit, copy, or colorable limitation thereof, and all plates, molds, matrices, and other means of making the same, shall be delivered up and destroyed. *The party seeking an order under this section shall give timely notice to the United States attorney for the judicial district in which such order is sought, and such United States attorney may, if such destruction may affect evidence of an offense against the United States, seek a hearing on such destruction or participate in any hearing otherwise to be held with respect to such destruction.*

*****

## ADDITIONAL VIEWS OF ROBERT W. KASTENMEIER ON H.R. 6071

The general question posed by this legislation is clear and succinct. Has an adequate showing been made that government intervention (through severe criminal penalties, augmented civil penalties, and ex parte seizures, coupled with possible treble damages) is necessary to enforce a system that theoretically should be privately enforced between proprietor and infringer. I am not confident that this question should be answered in the affirmative.

Trademark law, like copyright and patent law, is essentially a contract between proprietors and the public. In exchange for a government conferred "monopoly", the public benefits from a heightened form of consumer protection or by intellectual property passing into the public domain (either after the term of protection has expired or, in the case of trademarks, by being declared generic). The system is self--enforcing: that is, proprietors protect their own rights by suing in district court for infringement. There is rarely any need for government intervention to buttress the system. For example, the two entities charged with administering the system----the Patent and Trademark Office and the Copyright Office----do not have enforcement power nor have they requested Congress to provide it.

Proposals to extend governmental authority----either to the U.S. Department of Justice or the Federal Trade Commission----should be based on a clear finding that the existing system does not work. In the rush to legislate on this bill and several others,n1 I fear that we have failed to make this essential finding.

Absent a clear definition of the problem, formulation of an appropriate solution is very difficult. As related to trademark counterfeiting, I question whether the solution of criminal penalties to enforce the law is an appropriate response to the problem. Criminal sanctions for the violation of intellectual property rights are appropriate in the narrowest circumstances. In two copyright bills recently favorably reported by this Committee,n2 a decision was made to solve identified problems with civil and administrative remedies.

Several years ago, the Final Report of the National Commission on Reform of Federal Criminal Laws (Brown Commission) concluded that the criminal laws should establish a system of prohibitions, penalties, and correctional measures to deal with conduct that unjustifiably and inexcusably causes or threatens harm to those individual

[36]

or public interests for which federal protection is inappropriate. This recognizes, in the words of the Report's comment, that "...the criminal law serves, among other functions, as an expression of society's disapprobation of marked departures from social norms, but eschews organized vengeance as a goal of the system."n3

As a former member of the Brown Commission and also as one who has worked on intellectual property legislation during almost my entire tenure in Congress, I fear that the Commission's guiding principle is not met in the proposed legislation. H.R. 6071 appears to be based less on a finding that federal protection is necessary or appropriate than on a desire to co--opt the criminal justice system merely to enforce private economic interests. In this regard, the bill engages in overkill.

In conclusion, protection of trademarks----a meritorious goal----can better be achieved through other means than criminal penalties.

I nonetheless supported the bill in full Committee because I felt that a sustained effort was made by the Subcommittee Chairman to draw a delicate balance between the competing interests involved in the legislation.

98th Congress, 2d Session

To clarify the circumstances under which a trademark may be canceled or considered abandoned

SEPTEMBER 20, 1984

Mr. KASTENMEIER (for himself, Mr. RODINO, Mr. FISH, MOORHEAD, Mr. HYDE, Mr. DE WINE, Mr. KINDNESS, and Mr. SAWYER) introduced the following bill; which was referred to the Committee on the Judiciary

**FOOTNOTES:**
(n1) Footnote 1. See, e.g., H.R. 5929 (a bill that would amend the Federal Trade Commission Act to make trafficking in counterfeit goods and services a specific violation of the FTC Act. FTC authority to seize or order detention of such counterfeit goods, as ordered House Committee on Energy and Commerce.

(n2) Footnote 2. H.R. 5525 (the Semiconductor Chip Protection Act) and H.R. 5938 (the Record Rental Amendment of 1984). H.R. 5525 passed the House on June 11, 1984, by a vote of 38a decision was made to solve identified problems with civil and administrative remedies.

(n3) Footnote 3. Comment to section 102, Final Report to the National Commission on Reform of the Federal Criminal Laws (1971).